UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------- x

MAVERICK FUND, L.D.C., MAVERICK
FUND USA, LTD., MAVERICK FUND II,
LTD., MAVERICK NEUTRAL FUND, LTD.,
MAVERICK NEUTRAL LEVERED FUND,
LTD., MAVERICK LONG FUND, LTD.,
AND MAVERICK LONG ENHANCED
FUND, LTD.,

               Plaintiffs,

   vs.

LENDER PROCESSING SERVICES, INC.,
DOCX, LLC, JEFFREY S. CARBIENER,
FRANCIS K. CHAN, AND LORRAINE
BROWN

               Defendants.

---------------------------------------------- x

**13 CV 5474**

Civil Action No.

COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND
STATE LAW

DEMAND FOR JURY TRIAL



RECEIVED

AUG 0 6 2013

U.S.D.C. S.D. N.Y.
CASHIERS

**TABLE OF CONTENTS**

Page

I.    SUMMARY OF THE ACTION .................................................................................. 2

II.   JURISDICTION AND VENUE ................................................................................ 4

III.  THE PARTIES ........................................................................................................ 5

IV.   DEFENDANTS' FRAUDULENT SCHEME ........................................................... 8

     A.   LPS's Business ............................................................................................. 8

     B.   LPS Illegally Created Mortgage-Related Documents to Rapidly (and
         Cheaply) Process Foreclosures and Bankruptcies While Fraudulently
         Inflating Reported Short-Term Profits ......................................................... 9

     C.   Defendants' Illegal Document Creation Scheme Is Slowly Revealed and the
         Foreseeable Risks of Defendants' Illegal Conduct Materialized, Causing
         LPS's Stock to Drop Even as Defendants Continued to Mislead Plaintiffs ......... 15

     D.   Continuing Revelations of Defendants' Fraud .......................................... 22

V.    SCIENTER ALLEGATIONS ................................................................................. 26

     A.   Defendant Brown Orchestrated the Illegal Document Creation Scheme for
         the Purpose of Falsely Inflating Profits .................................................... 26

     B.   Defendants Carbiener and Chan Were Aware of or Recklessly Disregarded
         the Illegal Document Creation Scheme .................................................... 27

          1.   In The Early Part of The Relevant Period, Carbiener and Chan Knew,
              or Recklessly Disregarded the Illegal Document Creation Scheme ......... 27

          2.   Judge Sigmund Waved a Huge Red Flag in Front of Carbiener and
              Chan in April 2009 .......................................................................... 29

          3.   In October 2009, A Whistleblower Specifically Alerted LPS and its
              Auditors To The Illegal Document Creation Scheme .............................. 30

          4.   AHMSI Forced Defendants' Hand By Refusing to Go Along With
              The Illegal Document Creation Scheme .................................................. 30

          5.   Carbiener and Chan Admit to Learning of the Illegal Document
              Creation Scheme in November 2009, But Continued to Conceal
              The Truth From Investors For Nearly a Year .......................................... 32

**Page**

      6.    Defendants Carbiener and Chan's "Cover Up" Was Itself Exposed as a Fraud Only Months After Defendants Attempted to Downplay the Scope of the Scheme ............................................................. 34

      7.    Defendants Carbiener and Chan's Terminations and Other Miscellaneous Factors Indicative of Scienter ........................... 35

    C.    LPS Acted With Scienter ..................................................................... 36

    D.    DocX Acted With Scienter ................................................................... 38

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..................................... 39

VII.    LOSS CAUSATION ................................................................................................... 79

VIII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................................. 82

IX.    CAUSES OF ACTION ............................................................................................... 83

X.    PRAYER FOR RELIEF .............................................................................................. 98

XI.    JURY TRIAL DEMAND ............................................................................................ 99

Plaintiffs Maverick Fund, L.D.C., Maverick Fund USA, Ltd., Maverick Fund II, Ltd., Maverick Neutral Fund, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Long Fund, Ltd., and Maverick Long Enhanced Fund, Ltd. (hereafter referred to collectively as "Maverick" or "Plaintiffs") make the following allegations based on the investigation conducted by Plaintiffs' counsel, including, but not limited to, a review and analysis of Lender Processing Services, Inc. ("LPS" or the "Company") filings with the United States Securities and Exchange Commission (the "SEC"); media and securities analysts' reports about the Company; analyst conference calls; filings in various criminal proceedings involving LPS employees, and related press releases; the Non-Prosecution Agreement entered into between LPS and United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the Middle District of Florida dated February 14, 2013 (the "NPA"); the Agreed Consent Judgment Entry and Order entered into by the State of Ohio and Lender Processing Services, Inc., LPS Default Solutions, Inc., and DocX, LLC (and other similar agreements entered into with other states); the Consent Order entered into between Lender Processing Services, Inc., DocX, LLC, and LPS Default Solutions, Inc. and the Board of Governors of the Federal Reserve System, the Office of the Comptroller of Currency, the Federal Deposit Insurance Corporation and the Office of Thrift Supervision; the civil complaint evidencing the investigation by the Attorney General of the State of Nevada; filings in various bankruptcy proceedings involving documents prepared by LPS; court filings in the action styled *City of St. Clair Shores General Employees' Retirement System v. Lender Processing Services, Inc., et al.* (the "Class Action"); court filings in the action styled *American Home Mortgage Servicing, Inc. v. Lender Processing Services, Inc., and DocX, LLC*; testimony of percipient witnesses; consultations with experts; and the review and analysis of other matters of public record. While Plaintiffs have

reviewed, and may reference or utilize, these materials, Plaintiffs do not adopt any exculpatory language contained in these materials.

## I.    SUMMARY OF THE ACTION

1.    Plaintiffs purchased LPS common stock at times when the price of the shares was artificially inflated by Defendants' fraudulent scheme.  LPS was in the business of creating mortgage-related documents regularly used in foreclosures and bankruptcies.  In the wake of the housing bubble collapse in 2008 through 2010, business was good.  There was significant and growing demand for LPS's default services.  LPS capitalized on this demand for default services, playing a role in more than 50 percent of all foreclosures in the United States during the relevant period.  To keep up with demand, and report ever growing revenues and earnings, Defendants (unbeknownst to Plaintiffs) cut necessary quality controls and abandoned compliance with legal requirements.  LPS illegally robo-signed or rubber-stamped documents used to take away borrowers' homes.  As Illinois Attorney General Lisa Madigan put it, "LPS and its subsidiaries became a sort of document factory, literally rubber stamping thousands of foreclosures with no regard for fairness and accuracy in the process."

2.    Initially, the scheme went undetected.  LPS would create more than a million illegal documents over the span of years.  LPS reported profits artificially inflated by the Company's low-cost (albeit illegal) business structure.  Unbeknownst to investors, the million-plus fraudulently signed and notarized mortgage-related documents created by LPS were a ticking time bomb that would ultimately cause massive disruptions in foreclosures nationwide.

3.    Slowly at first, journalists, courts and regulators began to voice concerns.  LPS repeatedly and falsely defended its actions.  In spite of published concerns about LPS's practices, a whistleblower complaint and an internal investigation, Defendants continued to assure LPS investors

that they had conducted a thorough investigation and any reported problems were isolated incidents. Defendants steadfastly denied the existence of any widespread wrongdoing.

4.      In late September 2010, the time bomb set by Defendants' scheme was ready to explode.  Foreseeably, as anecdotal evidence of illegal forgeries and notarizations piled up, public faith in the legitimacy of the foreclosure process was shaken.

5.      On September 30, 2010, U.S. Representative Alan Grayson labeled LPS a "factory of fraud" that "created the means to systematize" the falsification of mortgage-related documents throughout the nationwide foreclosure process:

> The system is so organized that there is a company called Lender Processing Services, which allegedly has created the means to **systematize this fraud**.  Lawyers use the LPS system to request which affidavits and documents they need, LPS then has **document mills** where they can magically make an authorized vice president of whoever you need and send you back-dated signed documents saying that you have the right to foreclose.  Courts at first refused to believe this level of **rampant fraud** even exists¹ but more recently they've started to sanction fraud against loan servicers.[1]

6.      In conjunction with Representative Grayson outing LPS's conduct, several large banks and prominent politicians called for a moratorium on all foreclosures until trust in the legitimacy of the system could be restored.  In recognition of the implications this would have for LPS – including the risk of criminal prosecution and other legal action, damaged customer relationships, and destroyed credibility – LPS's stock price declined by 18%, falling from a close of $33.23 on September 30, 2010 to close at $27.31 on October 5, 2010.

7.      Representative Grayson's characterization of LPS as a "factory of fraud" would be borne out by subsequent investigations.  As the television show *60 Minutes* would later reveal, LPS

---

[1] All emphasis is added unless otherwise noted.

was "recreating missing mortgage assignments for the banks and providing the legally required signatures of bank vice presidents and notaries" to foreclose on homes.  According to the *60 Minutes* investigation, LPS paid high school students and other temporary workers $10 an hour to pose as bank "Vice Presidents" and methodically sign/forge **at least** 350 documents an hour – creating thousands of fraudulent mortgage documents a day per person.  The *60 Minutes* investigation was corroborated by other investigations, including the one conducted by the Attorney General for the State of Nevada.

8.      Ultimately, on February 15, 2013, LPS settled criminal allegations against it by entering into a Non-Prosecution Agreement with the Department of Justice ("DOJ") **admitting** to the fraud.  According to the DOJ press release:

> Lender Processing Services Inc. (LPS), a publicly traded mortgage servicing company based in Jacksonville, Fla., has agreed to pay $35 million in criminal penalties and forfeiture to address its participation in a six-year scheme to prepare and file more than 1 million fraudulently signed and notarized mortgage-related documents with property recorders' offices throughout the United States.

9.      Defendants' fraudulent scheme had profound impacts on many parties, including Plaintiffs.  Plaintiffs purchased LPS common stock while its price was artificially inflated as a result of the fraud.  Defendants' false and misleading statements about the true nature of LPS's business artificially inflated the price of LPS stock.  Upon disclosure of the truth concerning Defendants' statements, Plaintiffs were injured when LPS's stock price declined precipitously. Plaintiffs bring this action to recover investment losses caused by Defendants' fraudulent conduct.

## II.      JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §§1331, 1337, and 1367.

11.     Venue is proper in this District pursuant to §27 of the Securities Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §§1391 (b) and (c).  Substantial acts in furtherance of the wrongs alleged and/or their effects have occurred within this District.  Specifically, Plaintiffs' investment decisions were made in this District.  Plaintiffs relied upon Defendants' false statements in, and were injured in, this District.

12.     In connection with the acts and omissions alleged herein, all of the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     THE PARTIES

**Plaintiffs**

13.     Non-party Maverick Capital, Ltd. is a registered investment manager managing private investment funds exclusively for qualified investors.  The firm was founded in 1993 by, among others, Lee S. Ainslie III.  Maverick Capital, Ltd. has offices in Dallas, Texas and New York, New York.  Maverick Capital, Ltd. is the investment manager on behalf of Plaintiffs.

14.     Plaintiffs Maverick Fund, L.D.C., Maverick Fund USA, Ltd., Maverick Fund II, Ltd., Maverick Neutral Fund, Ltd., Maverick Neutral Levered Fund, Ltd., Maverick Long Fund, Ltd., and Maverick Long Enhanced Fund, Ltd. are private investment funds managed by non-party Maverick Capital, Ltd.  Maverick Capital, Ltd., as the money manager for Plaintiffs, had total investment discretion for Plaintiffs' investments.  Maverick Capital, Ltd. maintains an office in New York, New York and Plaintiffs' investment decisions were directed, controlled, and coordinated in New York.  Further, Plaintiffs suffered losses resulting from Defendants' fraud in New York.

15.     Plaintiffs and Maverick Capital, Ltd., as the investment manager for Plaintiffs, read and relied upon certain of Defendants' false and misleading statements alleged herein, as set forth in greater detail below.  In reliance on Defendants' material misrepresentations and omissions, as described below, Plaintiffs purchased LPS common stock and suffered substantial losses caused by Defendants' wrongful conduct.

16.     Plaintiffs purchased millions of LPS common shares during the period between August 6, 2008 and October 4, 2010, while LPS stock traded at artificially inflated prices.  Plaintiffs held substantial LPS shares through disclosures of the truth concerning, and the materialization of risks concealed by, Defendants' fraudulent scheme.  Plaintiffs' purchases and sales of LPS stock are set forth in Plaintiffs' trade data provided to Defendants by letter dated August 2, 2013.  Plaintiffs' trade data is incorporated by reference herein, which Plaintiffs will submit to the Court under seal upon request.

**Defendants**

17.     Defendant Lender Processing Services, Inc. is a Delaware company with its principal executive offices in Jacksonville, Florida.  Lender Processing Services, Inc. operates in the mortgage industry and is a leading provider of mortgage processing services, settlement services, and default solutions.  Lender Processing Services, Inc. is also a leading provider of integrated data, servicing, and technology solutions for mortgage lenders.  Lender Processing Services, Inc. and its subsidiaries, including DocX and LPS Default Solutions, are collectively referred to herein as "LPS."

18.     DocX, LLC ("DocX") d/b/a LPS Document Solutions Group was, throughout the relevant period, held out to the public as "LPS Document Solutions, a Division of LPS."  DocX maintained the bulk of its operations in Alpharetta Georgia.  DocX is, and was during the relevant period, a wholly owned subsidiary of Lender Processing Services, Inc, and is registered as a Georgia

corporation.  At all relevant times, Lender Processing Services, Inc. owned and controlled the operations of DocX, LLC.

19.     Defendant Carbiener was, at all relevant times, Lender Processing Services, Inc.'s President and Chief Executive Officer ("CEO"), until his resignation on July 6, 2011.

20.     Defendant Chan was, at all relevant times, Lender Processing Services, Inc.'s Executive Vice President and Chief Financial Officer ("CFO"), until the Company effectively terminated Chan on October 28, 2010.

21.     Defendant Lorraine Brown was during the relevant period an executive of Lender Processing Services, Inc. and the chief executive of DocX until her termination in late 2010. Brown's official title was President and Senior Managing Director of LPS Document Solutions. Brown worked in DocX's Alpharetta, Georgia office where she orchestrated the illegal fabrication of mortgage-related documents.  According to the NPA, the wrongful acts perpetrated by Lorraine Brown as detailed herein and in the NPA were performed within the scope of her employment at LPS.  Brown made direct and indirect false and misleading statements to the public impacting the price of LPS's stock price by falsely representing to, among others, LPS's clients, internal compliance department, and accounting department, that LPS had robust quality control procedures to ensure a thorough and proper signing, notarization and recordation process.

22.     Defendants Carbiener, Chan and Brown are collectively referred to herein as the "Individual Defendants."

23.     During the relevant period, the Individual Defendants, as senior executive officers of LPS, were privy to confidential and proprietary information concerning LPS, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning LPS, as discussed in detail

below.  Because of their positions with LPS, the Individual Defendants had access to non-public information about LPS's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had been misrepresented and/or had not been disclosed to, and were being concealed from, the investing public.

## IV.   DEFENDANTS' FRAUDULENT SCHEME

### A.    LPS's Business

24.    During the relevant period, according to LPS, the Company was a provider of integrated technology and services to the mortgage lending industry, with market leading positions in mortgage processing and default management services in the U.S.  LPS conducted its operations through two reporting segments, Technology, Data and Analytics and Loan Transaction Services.  A large number of financial institutions used LPS's solutions.  LPS's technology solutions included its mortgage processing system, which automates all areas of loan servicing, from loan setup and ongoing processing to customer service, accounting and reporting.   Loan transaction services included LPS's default management services, which were used by mortgage lenders, servicers, attorneys and trustees to reduce the expense of managing defaulted loans.

25.    The DocX business maintained a proprietary system called the Recorders Information Database ("RID"), which contained the various filing requirements and fees imposed by each of the thousands of county recorder's offices throughout the United States.  The main clients of the DocX business were residential mortgage servicers (the "servicers"), which typically had undertaken

certain services for mortgage lenders.  These duties included, among others, accepting and recording mortgage payments, paying taxes and insurance from borrower escrow accounts, and conducting or supervising the foreclosure process when necessary.

26.      DocX's servicer-clients could paid for access to the RID database.  Clients could also hire DocX to assist in creating and executing mortgage-related documents filed with recorders' offices.

> **B.      LPS Illegally Created Mortgage-Related Documents to Rapidly (and Cheaply) Process Foreclosures and Bankruptcies While Fraudulently Inflating Reported Short-Term Profits**

27.      LPS's improper business model and the economic downturn generated a tremendous volume of default services work, which Defendants were determined to rapidly process in order to drive market share and profits.  To accomplish this, LPS employed various illicit practices at all of its offices to churn as many files as quickly as possible, including the fabrication of documents, robo-signing, forging or surrogate signing, improper notarization of documents, violation of security protocols, and concealment of known mistakes from courts, attorneys, and clients.

**<u>Defendants Masterminded a Six-Year Scheme to Prepare and File More Than 1 Million Illegally Signed and Notarized Mortgage-Related Documents</u>**

28.      Beginning in or about 2003 and continuing through November 2009, employees of LPS at the direction of Defendant Brown and others began forging and falsifying signatures on the mortgage-related documents that LPS had been hired to prepare and file with property recorders' officers throughout the United States.

29.      Brown implemented these signing practices to enable LPS to generate profit. Specifically, LPS was able to create, execute, and file larger volumes of documents using these signing and notarization practices.  More documents meant more money, and more reported profits.

30.     To further increase profits, LPS hired temporary employees, who (i) worked at much lower costs and without the quality controls represented to LPS clients, and (ii) falsely signed thousands of documents a day.

31.     According to the DOJ, the exact number of documents created by LPS with fraudulent signatures and notarizations is not known, but the DOJ estimates that between 2003 and 2009, LPS created "well over 1 million such documents" that were filed with property recorders' offices throughout the country.

### LPS Fabricated Missing Assignments to Foreclose on Homeowners

32.     To foreclose on a home, a foreclosing entity must establish ownership of the mortgage at issue.  In the recent housing boom, mortgages were generated at an incredible pace and in many cases subsequently transferred to trusts owned by investors who bought securitized packages of mortgages.  Such a transfer requires the creation of a mortgage assignment that transfers ownership from the original lender to the next owner (*i.e.*, trusts).  However, as the media reported, many original lenders never handed over ownership to the trusts.  Only the holder or owner of a mortgage can institute a foreclosure action in the event that the homeowner stops mortgage payments.

33.     Without the assignments, LPS's customers could not complete foreclosures. Accordingly, through DocX, LPS produced significant numbers of invalid assignments on behalf of banks so that its clients could foreclose on homeowners.

### LPS Abused Client Authority and Required Employees to Robo-Sign Documents

34.     LPS managed default services for a significant portion of the industry, and as a result, had to execute and sign millions of documents that often required the signatures of bank officials. Since obtaining signatures on such a significant volume was very time-consuming, each client

designated people at DocX with "signing authority" for those clients.  Because different states required differently titled employees to sign documents such as Assignments of Title and Releases of Liens, the clients designated several titles to different LPS employees.  A corporate resolution between DocX and their clients gave DocX employees the authority to sign as client representatives. This was done solely to speed up the turnaround time.

35.    LPS abused this delegated signing authority to push through the large volume of foreclosures by requiring its employees to robo-sign documents needed to complete files for foreclosure.  Robo-signing involved employees signing documents without verifying or reviewing their content and, in many cases, not knowing what they were signing.  This was pervasive throughout LPS, as is evidenced by the testimony of Scott Walter ("Walter"), Vice President of LPS Default Solutions, who stated that LPS policy and procedure did not require affiants to have personal knowledge of the information in the affidavits they were executing.

**LPS Required Employees to Forge Signatures through an Arrangement Called Surrogate Signing**

36.    To expedite the robo-signing process and keep pace with the significant volume of documents that needed execution, LPS employed surrogate signing, which required its employees to sign or forge the names of those individuals at LPS who had been given signing authority by clients. While there were DocX managers with the authority to sign for banks, DocX instead used lower-level employees to forge the signatures of those authorized managers.

37.    LPS implemented an official policy called the "Document Solutions Group Surrogate Signer Policy," which attempted to legitimize the surrogate signing or forging practice by requiring the "authorized signer" and the corresponding "surrogate signer" to sign the form.  This policy provided that internal procedures with respect to surrogate signing had "been established to

minimize loss effectiveness due to a low number of in-house authorized corporate signers at various times."

38.    However, surrogate signing was not authorized by LPS clients and did not legitimize the false and fraudulent forging of signatures.  As evidenced by LPS's litigation with American Home Mortgage Servicing, Inc. ("AHMSI"), one of LPS's largest clients, surrogate signing was not sanctioned by LPS clients.

39.    LPS's surrogate signing practice resulted in forgery of significant quantities of documents.  Surrogates supposedly signing documents were actually forging documents.

40.    According to Chris Pendley's ("Pendley") interview for the television program *60 Minutes*, on his first day as a DocX employee, he was informed that he was going to be signing documents using someone else's name.  He recounted that he would sign documents as though he were a bank officer and would sometimes be "Vice President" of as many as five to six different banks on a given day.  Pendley explained that DocX employees had to sign at least 350 documents an hour and that he alone signed 4,000 a day, earning $10 an hour.  The *60 Minutes* episode also revealed that some of the supposed bank vice presidents at DocX were actually high school students.

41.    LPS's surrogate signing practices were also confirmed by former employee Cheryl Denise Thomas ("Thomas"), who testified that she personally signed an Assignment of Mortgage as a Vice President for Mortgage Electronic Registration Systems, even though she was not a vice president of that company.  Thomas explained that surrogate signers were told surrogate signing was legal and okay.  Thomas further testified that the surrogate signing procedures occurred before and after DocX became part of LPS.

42.    According to the Nevada Attorney General, at the LPS Default Solutions office in Minnesota, the company established a document execution "production line" to execute as many

documents as quickly as possible.  But in the rush to execute documents – and per LPS policies and procedures – LPS employees who signed documents were not placed under oath, did not sign in the presence of notaries, and/or did not have personal knowledge of the information to which they attested.  In an internal newsletter, LPS touted its "Document Execution" team as being "set up like a production line" to resolve each document request within 24 hours and to sign at least 1,000 documents per day.  A former supervisor of the Document Execution team in Minnesota explained that LPS actually executed almost 1,500 documents a day.

### LPS Falsified Notarizations

43.     In addition to forging documents and robo-signing without review, LPS also engaged in improper notarization.  To be valid, assignments and other mortgage-related documents had to be notarized.  Notarization reflects the authenticity of documents and signatures.  Despite the legal significance of notarization, LPS caused huge volumes of documents to be fraudulently notarized.  Mortgage assignments filed in county clerk offices show that LPS's signing and notarization practices were not limited to DocX but also occurred at LPS's other offices.

44.     For example, Thomas testified that she notarized anywhere between one to a thousand documents at DocX on any given day.  Thomas explained that she was instructed not to be in the room when assignments were signed and would notarize documents without seeing them signed.  Thomas raised questions to supervisors as to why many people (whose signatures she notarized) signed as corporate officers (*e.g.*, vice presidents, secretaries, etc.).  She was told to do what she was required to do, that it was "covered," and that there was legal documentation.  Thomas testified that Gaglione would keep her away from the signing room and told her it was none of her business who was in the room.  In addition, Thomas stated that she notarized documents she knew a surrogate had signed.

45.     Additionally, according to the Nevada Attorney General's investigation, former employees who notarized documents recalled that they were specifically instructed not to read the documents and were required to notarize a minimum of 250 documents an hour or about 2,000 documents per day per notary.  When the Signing Room at DocX was especially busy, notaries were asked to pre-notarize documents (*i.e.*, notarize documents before signature).

46.     LPS's problematic notarization practices were official Company policy.  According to Walter, Vice President of LPS Default Solutions, it was consistent with LPS policy and procedure for affidavits to be executed outside the presence of notaries.

### LPS Used its Improper Business Model to Cross-Sell Services

47.     Through its improper business model and illicit business practices, LPS successfully obtained new customers and generated significant revenues.  LPS brought customers into its system by providing low-cost document processing subsidized by the fraudulent robo-signing and falsification scheme, and then LPS was able to cross-sell a full range of its services to those customers.  The Company explained:  "The broad range of services we offer provides us with the opportunity to expand our sales to our existing customer base through cross-selling efforts.  We have established a core team of senior managers to lead account management and cross-selling of the full range of our services to existing and potential customers at the top 50 U.S. lending institutions."

### LPS's Illicit Practices Drove Revenues, Margins and Income to Rise

48.     Through LPS's improper business model and illicit practices detailed above, Defendants successfully exploited the market for default management services and increased revenues to unprecedented levels in an otherwise terrible economy.  LPS's default management services revenues more than doubled and grew to represent nearly 50% of total revenue.  LPS's

default services revenue quadrupled from $277.8 million in 2006 to more than $1 billion of annual revenue for both 2009 and 2010.

49.     Further, LPS was able to convert more of this revenue to income (margins) by artificially keeping costs low by utilizing the illegal practices described herein rather than employing qualified persons to properly prepare the mortgage-related documents for LPS's clients.

50.     Throughout the relevant period, Defendants touted high revenues, margins, income and LPS's significant market share, while deliberately failing to disclose the illicit practices and high-risk business model that drove these achievements.

51.     As detailed below, when the market began to learn of the illicit business practices, Defendants continued their fraud and maintained the artificial inflation in LPS's stock price through outright lies and false assurances to investors.  However, Defendants' scheme would eventually unravel.  When the improper business model and illicit business practices were more fully revealed, the legal and regulatory issues associated with LPS's practices had a significant and negative impact on the financial results of LPS and its customers.

**C.     Defendants' Illegal Document Creation Scheme Is Slowly Revealed and the Foreseeable Risks of Defendants' Illegal Conduct Materialized, Causing LPS's Stock to Drop Even as Defendants Continued to Mislead Plaintiffs**

52.     Defendants, like most perpetrators of fraud, did not simply admit to their fraudulent conduct all at once.  Rather, the truth concerning LPS's fraudulent practices came to light in bits and pieces.

53.     Beginning no later than April 3, 2010, through a series of partial revelations, the market slowly began to learn the truth of the various illegal business practices that Defendants were engaged in to drive LPS's earnings, revenue growth and market share.  As detailed below, rather than reveal the truth about LPS's illegal business practices, and Defendants' involvement in the

fraud, Defendants repeatedly denied any wrongdoing and misled the market about the true nature of LPS's business practices, their pervasiveness, the steps Defendants had taken to address those practices, and the impact of the illegal practices on LPS's financial condition.   Through their misrepresentations, omissions and outright lies and wrongdoing, Defendants endeavored to keep the truth hidden from the market and maintain an appearance of legitimacy.   Nonetheless, LPS had fraudulently "robo-signed"/surrogate-signed/forged and notarized so many mortgage documents, that Defendants couldn't conceal their wrongdoing indefinitely under the scrutiny of attorneys, judges and journalists who eventually uncovered the scheme.

54.   On Saturday April 3, 2010, *The Wall Street Journal* published an expose revealing that problems with foreclosure documents created by LPS were more widespread and blatant than LPS had previously indicated.   Moreover, according to sources who spoke with *The Wall Street Journal*, the previously disclosed investigation of LPS was far more serious than the Company had indicated and was being pursued as a criminal inquiry:

> Judges across the U.S. have prevented foreclosures after finding that the materials banks had submitted to them to support their claims were wrong.

> Now a subsidiary of a company that is a top provider of the documentation to banks for foreclosure actions is under investigation by federal prosecutors.

> Prosecutors are "reviewing the business processes" of the subsidiary of Lender Processing Services Inc., based in Jacksonville, Fla., according to the company's annual securities filing released in February.  ***People familiar with the matter say the inquiry is criminal in nature.***

> * * *

> Some lawyers representing homeowners have claimed that banks ***routinely file erroneous paperwork showing they have a right to foreclose when they don't.*** Firms that process the paperwork are either "producing so many documents per day that ***nobody is reviewing anything, even to make sure they have the names right, or you've got some massive software problem***," said O. Max Gardner, a consumer-

- 16 -

bankruptcy attorney in Shelby N.C., who has defended clients against foreclosure actions.

LPS was recently referred to in a case involving Sylvia Nuer, a Bronx, N.Y., homeowner who had filed for bankruptcy protection in 2008. Diana Adams, a U.S. government lawyer who monitors bankruptcy courts, said in a brief filed earlier this year that LPS signed a document that wrongly said J.P. Morgan Chase &Co. had once owned Ms. Nuer's loan.

Documents related to the loan were "***patently false or misleading***," she wrote. J.P. Morgan Chase, which has withdrawn its request to foreclose, declined to comment.

\* \* \*

LPS has acknowledged problems in its paperwork. In its annual securities filing, in which it disclosed the federal probe, the company said it had found "an error" in how Docx handled notarization of some documents. ***Docx also has processed documents used in courts that incorrectly claimed an entity called "Bogus Assignee" was the owner of the loan, according to documents reviewed by*** <u>***The Wall Street Journal.***</u>

Ms. Kersch said the "bogus" phrase was used as a placeholder. "***Unfortunately, on a few occasions, the document was inadvertently recorded before the field was updated***," she said.

55.     On April 5, 2010, to falsely reassure investors and prop-up LPS's stock price, LPS issued a press release responding to *The Wall Street Journal* article. Defendants' press release described the issue as merely an "error in the notarization of certain documents" by a subsidiary that performed services for "a limited number of customers" that were "unrelated to the Company's core default management services" and "immaterial to the Company's financial results." LPS assured the public that it "immediately corrected the business process and has completed the remedial actions necessary to minimize the impact of the error."

56.     Following the publication of *The Wall Street Journal* article, and despite Defendants' false and misleading press release, shares of LPS stock dropped 4.12%, or $1.57 per share, on April 5, 2010, to close at $36.54, on heavy trading volume. Had Defendants not falsely reassured the

market with the misleading statements in their press release, this stock drop would have been even more significant.

57.     As LPS so proudly boasted, its technology was utilized in more than 50 percent of all foreclosures in the United States during the relevant time period.  However, by executing over a million fraudulently signed and notarized mortgage-related documents for use in foreclosures around the country, LPS had created an undisclosed time bomb that could (and ultimately did) cause massive disruptions in foreclosures nationwide.  Beginning on September 29, 2010, and continuing through October 5, 2010, the material risks created by LPS's illegal and fraudulent signing practices materialized.  As evidence of the practices piled up, public faith in the foreclosure process was so shaken that banks and politicians alike called for a widespread moratorium on all foreclosures.

58.     On September 29, 2010, J.P. Morgan Chase – one of LPS's two biggest clients – revealed it would freeze foreclosures because it was concerned about widespread forgeries.  As the *Washington Post* reported:

> J.P. Morgan Chase, one of the nation's leading banks, announced Wednesday that it will freeze foreclosures in about half the country because of flawed paperwork, a move that Wall Street analysts said will pressure the rest of the industry to follow suit.
>
> The bank's decision will affect 56,000 borrowers in 23 states where allegations of ***forged documents and signatures*** and other similar problems are being used to try to overturn court-ordered evictions.  Yet the impact may be much broader, given J.P. Morgan's stature in the industry.  If other banks adopt the same approach, the foreclosure process in many parts of the country will grind to a halt.

59.     On September 30, 2010, U.S. Representative Alan Grayson posted a video on youtube.com, discussing various issues with respect to mortgage fraud and connecting the roles played by the banks, servicers and LPS.  In particular, he detailed LPS's illicit practices and called LPS a "factory of fraud."  Grayson revealed:

Fraud is rampant [in the foreclosure process.]

\* \* \*

[B]ig bureaucratic loan servicers are . . . foreclosing with forged documents. . . .

\* \* \*

[The banks] didn't keep good records and violated the laws mandating that they file records with the county clerk on who owned what mortgage title. . . .

\* \* \*

Obviously, the banks do not want to grapple with the consequences of trillions of dollars of securitized mortgages, having no legal standing to foreclose. ***So they have simply created a system where servicers hire foreclosure mill law firms, whose business is to forge documents showing or purporting to show that they have a legal right to foreclose***.  Some of these foreclosure mills have been featured in *The New York Times*.

And, so-called robo-signers, people whose names appear on thousands of affidavits.  These appear despite obvious forgeries and overt omissions and in cases where these people admit that they had no knowledge of what they were signing.

The system is so organized that there is a company called Lender Processing Services, which allegedly has created the means to systematize this fraud.  Lawyers use the LPS system to request which affidavits and documents they need, ***LPS then has document mills where they can magically make an authorized vice president of whoever you need and send you back-dated signed documents saying that you have the right to foreclose.  Courts at first refused to believe this level of rampant fraud even exists but more recently they've started to sanction fraud against loan servicers***.

Here are some examples of signature forgeries used on documents filed with the courts.  These are four clearly forged signatures of document mill employee Linda Green.  Here are six signatures of Christina Wang and here are three obvious forgeries of Taiwana Thomas.

Finally, this is a mortgage assignment filed with the recorders office in which the foreclosing firm forgot to put the name of the assignee.  So they instead put "bogus assignee."  The filing firm simply forgot to change the template for whose home, which family's home, they wanted to take.  ***This is a factory of fraud***.

60.    On October 3, *The New York Times* reported:

As some of the nation's largest lenders have conceded that their foreclosure procedures might have been improperly handled, lawsuits have revealed myriad missteps in crucial documents.

The flawed practices that GMAC Mortgage, JPMorgan Chase and Bank of America have recently begun investigating are so prevalent, lawyers and legal experts say, that additional lenders and loan servicers are likely to halt foreclosure proceedings and may have to reconsider past evictions.

Problems emerging in courts across the nation are varied but all involve documents that must be submitted before foreclosures can proceed legally. Homeowners, lawyers and analysts have been citing such problems for the last few years, but it appears to have reached such intensity recently that banks are beginning to re-examine whether all of the foreclosure papers were prepared properly.

61. On October 4, 2010, in response to continued media reports and government investigations calling into question LPS's default-related services that it provides to mortgage lenders and servicers, LPS issued a press release commenting on what it considered "recent mischaracterizations in the media regarding the default-related services LPS provides to mortgage lenders/servicers." The press release was LPS's attempt at a cover-up of the truth. The ticking time bomb LPS created was blowing up. Defendants' efforts to assuage investor concerns were overwhelmed as the evidence of their wrongdoing continued to surface.

62. On October 5, 2010, *The New York Times* published an article entitled "Foreclosure Furor Rises; Many Call for a Freeze," describing "an uproar over bad conduct by mortgage lenders" by federal lawmakers (including U.S. Senators Al Franken and Robert Menendez) and state law enforcement figures calling for a federal investigation and freezes on foreclosures. The article addressed concerns about robo-signing and specifically noted LPS's role in the foreclosure process and its recent stock price slide:

Meanwhile, shares of a major foreclosure outsourcing company, Lender Processing Services of Jacksonville, Fla., fell 5 percent on Tuesday, adding to a slide that began last week.

The company's documentation practices are stirring questions, including how the same employee can have wildly varying signatures on mortgage documents. L.P.S. blamed a midlevel manager's decision to allow employees to sign forms in the name of an authorized employee. It says it has stopped the practice.

The United States Attorney's Office in Tampa began investigating L.P.S. in February. An L.P.S. representative could not be reached Tuesday for comment.

63.     As the foreseeable risks inherent in Defendants' undisclosed, illegal signing practices began to materialize, the price of LPS common stock plummeted 18%, falling from a close of $33.23 on September 30, 2010 to close at $27.31 on October 5, 2010, on unusually heavy trading volume.

64.     Investors and the market more generally fully understood the Company's sharp stock price decline from October 1 through October 5 was the direct result of disclosures concerning the Company's falsification of mortgage-related documents, and the materialization of the risk associated with such illegal conduct. Indeed, as *The Florida Times Union* reported on October 6, 2010:

Lender Processing Services Inc.'s stock dropped Tuesday for the third straight trading day as news reports about bogus documents in the mortgage foreclosure process also served to highlight the company's role in foreclosures and allegations of wrongdoing against LPS.

\* \* \*

But in the past two weeks, several of the nation's biggest lenders have halted foreclosure proceedings because of concerns that mortgage companies are filing cases without proper documentation to show who holds the mortgage. Those lenders include Bank of America, JPMorgan Chase and GMAC Mortgage.

That has made investors nervous about LPS for two reasons. One is that a slowdown in mortgage foreclosures will reduce the company's revenue from the default services business. Second, the foreclosure halt has once again raised concerns that Docx or other LPS subsidiaries may have acted improperly to create new documents when mortgage lenders did not have the proper paperwork for a foreclosure.

- 21 -

LPS' stock fell $1.75 Friday and dropped another $2.72 on Monday.  And after trading as low as $25.50 Tuesday afternoon - its lowest level since April 2009 - it closed at $27.31, down $1.45 on the day.

65.     Similarly, on October 7, 2010, *The Florida Times Union* reported LPS's stock had recently fallen "as much as $7.73 over three trading days to a 18-month low of $25.50 . . . ***prompted by concerns about LPS' role in the mortgage foreclosure process nationwide, amid reports that lenders seeking to foreclose don't have the proper documentation to proceed and are producing false documents***."

### D.     Continuing Revelations of Defendants' Fraud

66.     On October 13, 2010, *The Wall Street Journal Online* published an article entitled "Probe Targets Foreclosure Paperwork; Tens of Thousands of Proceedings Are Suspected of Being Tainted; Return of the 'Robo Signers.'"  The Florida Attorney General was investigating the practices of LPS and four foreclosure law firms that may have led to "'fabricated documents' [being] used in foreclosure actions in court " and "improper paperwork taint[ing] tens of thousands of foreclosures."  The article quoted Florida Attorney General Bill McCollum:  "There was a long history, apparently, of robo-signings."

67.     On October 28, 2010, LPS issued a Form 8-K announcing that Chan would no longer serve as CFO and would be leaving LPS effective November 21, 2010.

68.     On October 29, 2010, LPS held an earnings conference call with securities analysts in which Carbiener addressed various legal and regulatory issues facing LPS, including a subpoena recently received from the Florida Attorney General and other recent inquiries from state and federal regulators.  Carbiener admitted that LPS's signing issues had existed for "a long period of time" and that he and others had discovered such issues in the course of their "on-going reviews of internal

business processes, including our document preparation and signing processes."   Specifically, Carbiener stated:

> As a matter of course, we have historically performed on-going reviews of internal business processes, including our document preparation and signing processes.
>
> * * *
>
> [O]ur reviews led to the discovery of the signing issues previously disclosed in Docx, a small company that became part of LPS when we spun out of FIS in mid-2008.
>
> * * *
>
> [I]n late 2009, LPS discovered that a manager of Docx had allowed some employees to sign another authorized employee's name on certain documents with that employee's written consent. We immediately halted the practice, dismissed the manager, remediated the impacted documents, forwarded the remediated documents to our clients or their attorneys, and closed the operation.

69.     On December 6, 2010, *Reuters* released an investigative report on LPS entitled, "Special Report: Legal Woes Mount for a Foreclosure Kingpin."   The report detailed myriad legal issues surrounding LPS's dubious documentation practices, including an "intensifying" criminal investigation by federal prosecutors and the FBI.   *Reuters* observed that the documentation issues "pose a bigger threat to the company than Carbiener let on," extending not only to DocX, but to LPS Default Solutions, a unit that "produced documents of dubious authenticity in far larger quantities than it has disclosed, and over a much longer timespan," and to signing operations conducted by LPS personnel at client locations.   The report also noted that, despite Carbiener's public assertion that LPS had taken immediate remedial actions upon discovery of DocX's wrongdoing in late 2009, LPS allowed the troubled subsidiary to continue signing documents until May 2010 and to remain in existence until August 2010.

70.     On April 3, 2011, the television program *60 Minutes* aired a segment on LPS, detailing the robo-signing and forging of documents that occurred at DocX.

71.     On July 6, 2011, Defendant Carbiener resigned.

72.     On August 23, 2011, AHMSI, one of LPS's largest clients, filed a petition against LPS and DocX alleging millions of dollars in losses "as a result of [LPS and DocX's] unauthorized execution and notarization of assignments affecting more than 30,000 residential mortgages in Texas and throughout the United States."  At issue was the use of surrogate signers to execute mortgage assignments on behalf of individuals specifically authorized by AHMSI.  AHMSI asserted that the scope of this practice "was far greater than [LPS] initially represented," forcing AHMSI to address "a myriad of legal issues, problems and proceedings in venues around the country" and resulting in the delay or restart of thousands of foreclosure actions.  Of particular note, AHMSI's petition revealed that LPS knew of surrogate signing practices at DocX no later than November 2009, and knew such issues were significant.  Indeed, the lawsuit revealed the issues were significant enough that AHMSI had sought indemnification from LPS in February 2010 – far earlier than Defendants ever disclosed the truth to Plaintiffs.

73.     On November 20, 2012, Defendant Lorraine Brown pleaded guilty to committing wire and mail fraud.  According to the DOJ:

> A former executive of Lender Processing Services Inc. (LPS) – a publicly traded company based in Jacksonville, Fla. – pleaded guilty today, admitting her participation in a six-year scheme to prepare and file more than 1 million fraudulently signed and notarized mortgage-related documents with property recorders' offices throughout the United States.
>
> * * *
>
> "Lorraine Brown participated in a scheme to fabricate mortgage-related documents at the height of the financial crisis," said Assistant Attorney General Breuer.  "She was responsible for more than a million fraudulent documents entering the system, directing company employees to forge and falsify documents relied on by property recorders, title insurers and others."
>
> * * *

- 24 -

Also according to plea documents, Brown implemented these signing practices at DocX to enable DocX and Brown to generate greater profit. Specifically, DocX was able to create, execute and file larger volumes of documents using these signing and notarization practices.  To further increase profits, DocX also hired temporary workers to sign as authorized signers.  These temporary employees worked for much lower costs and without the quality control represented by Brown to DocX's clients. Some of these temporary workers were able to sign thousands of mortgage-related instruments a day.  Between 2003 and 2009, DocX generated approximately $60 million in gross revenue.

After these documents were falsely signed and fraudulently notarized, Brown authorized DocX employees to file and record them with local county property records offices across the country.  Many of these documents – particularly mortgage assignments, lost note affidavits and lost assignment affidavits – were later relied upon in court proceedings, including property foreclosures and federal bankruptcy actions.  Brown admitted she understood that property recorders, courts, title insurers and homeowners relied upon the documents as genuine.

74.     On January 29, 2013, Defendants Lender Processing Services, Inc. and DocX, LLC signed an Agreed Consent Judgment Entry and Order in which these Defendants stipulated to the fact that DocX and other subsidiaries of Lender Processing Services, Inc. had generated and/or executed mortgage loan documents with defects (including unauthorized signatures, improper notarizations, and/or attestations of fact not personally known to or verified by the affiant) and caused such documents to be filed in courts and/or used in foreclosure processes.  Moreover, Defendants Lender Processing Services, Inc. and DocX, LLC stipulated:  "***On or around November 2009, Lender Processing Services, Inc., conducted an internal review of DocX and identified certain Mortgage Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other deficiencies.***"

75.     On January 31, 2013, LPS announced a "multi-state settlement, which includes an aggregated payment by LPS of $127 million, resolves inquiries surrounding the company's default operations, including former document preparation, verification, signing and notarization practices

of certain operations."   According to the Illinois Attorney General Lisa Madigan, "LPS and its subsidiaries became a sort of document factory, literally rubber stamping thousands of foreclosures with no regard for fairness and accuracy in the process."

76.     On February 15, 2013, Defendant LPS entered into the Non-Prosecution Agreement with the U.S. Department of Justice.

77.     In conjunction with entering into the NPA, LPS agreed to pay $35 million in criminal penalties and forfeiture for its participation in a six-year scheme to prepare and file more than 1 million fraudulently signed and notarized mortgage-related documents with property recorders' offices throughout the United States.

78.     On June 25, 2013, Defendant Lorraine Brown was sentenced to serve five years in prison.

## V.    SCIENTER ALLEGATIONS

### A.    Defendant Brown Orchestrated the Illegal Document Creation Scheme for the Purpose of Falsely Inflating Profits

79.     Defendant Brown masterminded a six-year scheme in which LPS made money by knowingly and illegally forging over a million mortgage-related documents to be used in bankruptcy and other court proceedings.

80.     According to the DOJ, Brown "was responsible for more than a million fraudulent documents entering the system, directing company employees to forge and falsify documents relied on by property recorders, titled insurers and others."

81.     According to the plea agreement Brown entered into with the government, Brown implemented the illegal signing practices to enable LPS and Brown to generate greater profit. Specifically, LPS was able to create, execute and file larger volumes of documents using illegal

practices – rather than by running legitimate business operations as Defendants had represented to the investing public.

82.     Brown, in her plea agreement, admitted she knew documents forged by LPS would be used and relied upon by courts, title insurers, property recorders and others.

**B.     Defendants Carbiener and Chan Were Aware of or Recklessly Disregarded the Illegal Document Creation Scheme**

83.     Throughout the relevant period, Carbiener and Chan knew, or were severely reckless in not knowing, of LPS's illicit business practices and improper business model.  As detailed below, Carbiener's and Chan's scienter is evidenced by: (a) the relative importance of DocX to the LPS growth story, and Carbiener's and Chan's access to non-public information concerning DocX's business and rapid growth, which information would have made the massive fraud readily apparent; (b) numerous red flags requiring that Carbiener and Chan investigate LPS's document execution services, including (but not limited to) DocX's operations, prior to publicly speaking to the market; (c) credible whistleblower revelations of the DocX fraud; (d) Carbiener's admitted investigation of LPS's document execution practices; (e) Carbiener's and Chan's involvement with constant media scrutiny, litigation, and government investigations into LPS's business; and, (f) Carbiener's and Chan's repeated assertions of knowledge concerning the business units directly committing the illegal practices described herein.  Collectively, these indicia demonstrate that Carbiener and Chan knew, or, at a minimum, were severely reckless in not knowing, of LPS's illicit business practices during the relevant period.

**1.     In The Early Part of The Relevant Period, Carbiener and Chan Knew, or Recklessly Disregarded the Illegal Document Creation Scheme**

84.     As alleged herein, illegal document "robo-signing" and other improper practices happened at multiple LPS business units.  In particular, the illegal document creation scheme was

running rampant at DocX. DocX was a critical component of the LPS growth story. DocX's services were critical to LPS's cross-selling efforts to capture more of each client's mortgage-related business. And, DocX was critical to LPS's earnings and revenue growth.

85. The vast bulk of DocX's business, however, was based on a fraudulent scheme. DocX created out of thin air fabricated loan documents. DocX created thousands of such forged, fabricated documents a day. DocX did so at minimal cost. DocX didn't hire the quantity and quality of employees that would be needed to properly handle such paperwork; rather, DocX had temporary employees making $10 per hour cranking out thousands of forged, fabricated documents a day. The numbers simply didn't make sense. Every day DocX created thousands of time and labor-intensive, critically important documents, requiring individual attention – without incurring any substantial overhead and without having to hire large numbers of qualified employees. DocX was a blatant fraud hidden beneath only the most cursory veneer of plausible deniability.

86. DocX was a fraud that Defendants Carbiener and Chan welcomed so long as it helped create profit for LPS and went undetected. No CEO or CFO could have possibly been ignorant to the ongoing rampant fraud at DocX.

87. Defendants Carbiener and Chan's willful ignorance and/or knowledge of the rampant fraud perpetrated at DocX is further highlighted by their repeated assertions of knowledge about DocX and its business practices. Throughout the relevant period, Carbiener and Chan addressed investors' questions concerning DocX, demonstrating a close familiarity with the business and its operations.

88. Defendants Carbiener and Chan's willful ignorance and/or knowledge of the rampant fraud perpetrated at DocX is further highlighted by their obligation to investigate and represent to

investors that LPS's disclosures to the market were truthful and complete, as set forth in Carbiener's and Chan's Sarbanes-Oxley ("SOX") certifications alleged herein.

### 2. Judge Sigmund Waved a Huge Red Flag in Front of Carbiener and Chan in April 2009

89.    On April 16, 2009, after the market closed, the *Dow Jones Daily Bankruptcy Review* published an article entitled "DOJ Probing Mortgage Data Processing Firms." The article reported on an opinion issued by The Honorable Bankruptcy Judge Diane Weiss Sigmund. Judge Sigmund, as reiterated in the article, warned LPS its proprietary loan document processing system was making mistakes that offended the judicial process. Of note, Judge Sigmund cautioned: "***The thoughtless mechanical employment of computer-driven models and communications to inexpensively traverse the path to foreclosure offends the integrity of our American bankruptcy system***." Similarly, Judge Sigmund warned that although LPS's system "has many features that make a volume business process more efficient, the ***users may not abandon their responsibility for fairness and accuracy to the seduction of electronic communication.***" Judge Sigmund asserted the use of the LPS system "***sacrificed accuracy and fairness to efficiency and cost-savings***." In sum, Judge Sigmund warned Defendants Carbiener and Chan that LPS's processes needed to be closely scrutinized because they were making material mistakes.

90.    In light of the rampant, ongoing fraud at DocX, any investigation by Carbiener and Chan would have readily uncovered the falsification and forgery of loan documents.

91.    Rather than finding and disclosing the fraudulent practices, on April 17, 2009, Defendants issued a press release (as detailed in ¶159), refuting the suspicion raised by the *Dow Jones Daily Bankruptcy Review* article and Judge Sigmund's Order, as it concerned LPS's business practices.

- 29 -

92.     Despite Judge Sigmund's clear admonition of potential problems with DocX's systems for processing mortgage-related documents, Defendants continued to falsely reassure investors that LPS and DocX were running an efficient, and professional business that complied with applicable laws and regulations.

### 3.     In October 2009, A Whistleblower Specifically Alerted LPS and its Auditors To The Illegal Document Creation Scheme

93.     According to the NPA:  "In October 2009, an individual sent a letter to LPS's external auditors who transmitted it to LPS corporate headquarters in Jacksonville alleging fraud and forgery in the execution of documents related to his mortgage by DocX.  Upon receipt of the letter, LPS corporate representatives confronted Brown."

94.     Shortly after receiving the whistleblower complaint, LPS terminated Brown's employment.

95.     Defendants Carbiener and Chan, as LPS's most senior executives, would have been informed of the whistleblower complaint by the Company's auditor.  They would have been informed of any subsequent investigation.  And, Carbiener and Chan would have been involved in the decision to fire Brown.

96.     Nonetheless, despite being informed of the fraud in October 2009, Defendants Carbiener and Chan did not disclose the fraudulent scheme to the market, but rather continued to conceal both the nature and scope of the illegal practices that were rampant at LPS.

### 4.     AHMSI Forced Defendants' Hand By Refusing to Go Along With The Illegal Document Creation Scheme

97.     Initially, on November 12, 2009, LPS – through its counsel Sheryl Newman – attempted to have AHMSI ratify the practice of surrogate signing by LPS.  Significantly, LPS did not disclose, but obscured, the parameters of the surrogate signing practice in its communications to

AHMSI's board of directors.  AHMSI's board of directors refused to provide the requested ratification.  Notably, as a matter of law, AHMSI did not have authority to approve LPS's use of perjury to create mortgage related documents.

98.     In November 2009, subsequent to AHMSI's refusal to provide the requested ratification, LPS disclosed to AHMSI it used a surrogate signing practice.

99.     AHMSI demanded that LPS remedy the problem, and reimburse AHMSI for any damages resulting from LPS's illegal conduct.

100.     As set forth in documents filed in open court, LPS's Senior Vice President and Chief Litigation Counsel Sheryl Newman and LPS's Executive Vice President, General Counsel and Corporate Secretary Todd Johnson, were involved in discussions with AHMSI over the surrogate signing practices at LPS at least as early as November 12, 2009.  While it is possible Ms. Newman and Mr. Johnson failed to disclose the truth concerning the surrogate singing practices to Defendants Carbiener and Chan in November 2009, it is highly unlikely.  Nonetheless, Defendants Carbiener and Chan continued to conceal both the nature and scope of the illegal practices that were rampant at LPS.

101.     Indeed, throughout the period from February 2010 through October 2010, while Defendants were continually reassuring investors that the problems at LPS were minimal and had been "remediated" – AHMSI was in constant contact with LPS.   During this period, AHMSI repeatedly informed LPS that LPS needed to do more to discover the scope of the improperly processed documents, fix the problem and reimburse AHMSI.  For example, by letter dated October 11, 2010, AHMSI sought "reimbursement in the amount of $4,111,446.00 for expenses, including attorney fees and costs, incurred to date in connection with AHMSI's on-going remediation efforts relating to restarting foreclosures that have become invalid in the state of New York due to the

'surrogate signor' program."  Defendants Carbiener and Chan didn't disclose the scope of the problems at LPS, but rather repeatedly concealed these problems from investors.

     **5.**     **Carbiener and Chan Admit to Learning of the Illegal Document Creation Scheme in November 2009, But Continued to Conceal The Truth From Investors For Nearly a Year**

102.    On November 20, 2012, far after the relevant period and after Defendant Brown pleaded guilty to federal criminal charges in Florida for her role in the fraud to falsify mortgage-related documents, LPS spokeswoman Michelle Kersch admitted:  "When ***LPS discovered these practices in November 2009***, it immediately discontinued the practices, terminated Ms. Brown and shut down the operations of DocX."

103.    Similarly, LPS ***stipulated*** in agreements with various State Attorneys General to discovering the illegal signing practices in November 2009:  "On or around November 2009, Lender Processing Services, Inc., conducted an internal review of DocX and identified certain Mortgage Loan Documents that contained inaccuracies, unauthorized signatures, notarization defects, or other deficiencies."

104.    Thus, LPS admitted to learning about LPS's subsidiary DocX's falsification and forgery scandal at least as early as November 2009.  As the most senior executives of LPS, Defendants Carbiener and Chan knew about, but concealed, the rampant falsification of mortgage-related documents from (at least) November 2009 through October 2010, when it could no longer be hidden.

105.    In an effort to downplay the widespread fraudulent nature of LPS's default solutions unit, and spin the truth of what happened and avoid creating massive problems with foreclosures around the nation, Defendants Carbiener and Chan disclosed the existence of a ***minor*** problem at

DocX **but** falsely asserted (i) it was isolated, (ii) that LPS fixed the problem, and (iii) it was not

material to investors.

106.    On April 23, 2010, Carbiener spoke at length of his initial discovery of the problems

at DocX, but in doing so he concealed the true scope of the issues plaguing LPS:

> Now, as part of our enterprise risk management process, we were reviewing the business processes of that subsidiary late last year, **and we discovered that there was a problem with one of the processes that caused an error in the notarization process**. So when we found or when we saw that error, we stepped in, we quickly corrected the process, we notified the impacted customers, and we began the remediation process.
>
> The one thing I will add because that's all in the disclosure, is that part of our remediation was to sit down with the management of that subsidiary, interview the management of that subsidiary so that we could make sure that in our minds, the business process that broke down was because of bad judgment, not because of ill intent. And through those efforts, we became very satisfied that we could remediate, and that it was just true poor judgment and bad process.
>
> * * *
>
> So again, we can say that with the actions we've taken to date, we believe that we have taken the necessary remedial action, and we've satisfied ourselves that the issue was the result of poor decision-making, not ill or criminal intent.

107.    On October 29 2010, Defendant Carbiener admitted "in late 2009, LPS discovered

that a manager of DocX had allowed some employees to sign another authorized employee's name

on certain documents with that employee's written consent. We immediately halted the practice,

dismissed the manager, remediated the impacted documents, forwarded the remediated documents to

our clients or their attorneys, and closed the operation."

108.    As we now know, the document-signing issues at DocX were clearly the result of

**widespread** illegal conduct, **not isolated** incidents. Any real review of DocX's practices would have

quickly uncovered hundreds of thousands, if not millions, of illegally created documents. Moreover,

LPS was alerted to the problems not through its own risk management procedures, but by a

whistleblower.  Defendant Carbiener's April and October 2010 admissions reveal not only that he was aware of the fraud at least as early as late 2009 – but that he was either extraordinarily reckless in his account of the truth or that he was actively engaged in covering up the scope of the fraud.

109.    As Defendant Chan participated in both the April and October conference calls with Carbiener, and as the Company's CFO and a signer of the SOX Certifications over LPS's financial statements, the inference of scienter stemming from these admissions is equally applicable to Defendant Chan.

> **6.    Defendants Carbiener and Chan's "Cover Up" Was Itself Exposed as a Fraud Only Months After Defendants Attempted to Downplay the Scope of the Scheme**

110.    Defendants Carbiener and Chan would have the public and this Court believe that as soon as they discovered improper signing practices at DocX, they fully and truthfully informed the public of the problem and closed down this subsidiary.  However, only months after Carbiener and Chan purported to come clean on the DocX scheme, *Reuters* published an expose showing Carbiener and Chan's story was lacking in both accuracy and completeness.

111.    On December 6, 2010, *Reuters* published a story titled:  "Legal Woes Mount for a Foreclosure Kingpin."   According to *Reuters*:

> Lender Processing Services is riding the waves of foreclosures sweeping the United States, but in late October its CEO, Jeff Carbiener, found himself needing to reassure investors in the $2.8 billion company.

> Although profits were rolling in, LPS's stock had taken a hit in the wake of revelations that mortgage companies across the country had filed fraudulent documents in foreclosures cases.  Earlier in the year, the company, which handles more than half of the nation's foreclosures, had disclosed that it was under federal criminal investigation and admitted that employees at a small subsidiary had falsely signed foreclosure documents.

> Still, Carbiener told the Wall Street analysts in an October 29 conference call that LPS's legal concerns were overblown, and the stock has jumped 13 percent since its close the day before the call.

> *But a Reuters investigation shows that LPS's legal woes are more serious than he let on.  Public records reveal that the company's LPS Default Solutions unit produced documents of dubious authenticity in far larger quantities than it has disclosed, and over a much longer timespan*.

112.    Similarly, *Reuters* poked other holes in the narrative told by Carbiener and Chan.

For example, *Reuters* reported:

> In his October 29 conference call with analysts, Carbiener said that when the company discovered the DocX wrongdoing in December 2009, it immediately stopped it and soon shut DocX down.  But it turns out that DocX continued operating much longer than LPS originally had acknowledged.  In a written response last week to questions from Reuters, LPS's Kersch confirmed that DocX actually wasn't closed until August 2010.

113.    That *Reuters* could – without the same access to LPS's internal documents and employees – readily demonstrate the scope of the fraud was far greater than indicated by Carbiener and Chan significantly undermines any competing inference that Defendants acted without intent to defraud investors.  The scope of the illegal signing practices would have been readily apparent to Defendants, who had far more access to relevant evidence than did *Reuters*.  Evidence that a Defendant has taken steps to cover-up a misdeed is strong proof of scienter.

### 7.    Defendants Carbiener and Chan's Terminations and Other Miscellaneous Factors Indicative of Scienter

114.    Shortly after the end of the relevant period, upon indications of the true scope of the illegal document fabrication and forgery scheme at LPS, Defendant Chan was unceremoniously terminated by LPS when, on October 28, 2010, LPS announced that Chan would no longer serve as Chief Financial Officer of the Company, and would be leaving the Company effective as of November 21, 2010.

115.    Similarly, on July 6, 2011, Defendant Carbiener resigned.

116.    Throughout the relevant period, Defendants Carbiener and Chan signed SOX certifications attesting to, among other things, that they had "designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

117.    Moreover, Defendants Carbiener and Chan repeatedly stated the Company conducted internal reviews of the business processes used by its business units, including DocX, and this information was reported to Carbiener and Chan.

118.    Defendants repeatedly spoke on, among other things, market concerns over LPS's document signing practices.  Defendants' own statements revealed familiarity with the issues at the heart of this litigation, and therefore supported strong inference of scienter.

119.    Defendants Carbiener and Chan repeatedly assured investors that reports of errors in documents prepared by LPS were isolated incidents immaterial to LPS's overall business, when in reality LPS had engaged in widespread fraud impacting over a million documents that would cause the Company to suffer massive penalties and expenses.  Statements so objectively out of line with the truth contribute to a strong inference of scienter.

### C.    LPS Acted With Scienter

120.    LPS's scienter can be inferred from the strong inference of scienter pleaded as to Defendant Brown.  Defendant Brown was an employee of LPS, acting with the scope of her employment when she conducted the acts detailed herein.  Brown was acting in furtherance of LPS's goals; *i.e.,* increasing profits.  Defendant Brown was an executive at LPS.  Further, Defendant

Brown furnished false information to LPS regarding the DocX subsidiary knowing such information would become the basis of LPS's false and misleading public statements.

121.    LPS's scienter can be inferred from the strong inference of scienter pleaded as to Defendants Carbiener and Chan, who made and/or authorized the false statements at issue herein.

122.    Other high-level officers, known and unknown, contributed to the preparation and issuance of LPS's false and misleading statements made during the relevant period, and their scienter may be attributed to the Company.

123.    Notably, pursuant to Section 307 of SOX and 17 C.F.R. §205, LPS's in-house counsel were required to inspect the truthfulness of SEC filings and report violations of securities laws by the issuer.  LPS's in-house counsel – Sheryl Newman and Todd Johnson – knew of LPS's illegal document creation practices from their involvement in the AHMSI dispute and subsequent litigation.  In November 2009, LPS notified AHMSI of the surrogate signing practice – a euphemism for forgery.  At least as early as November 12, 2009, Ms. Newman and Mr. Johnson knew that LPS had used in the past "designees" as surrogate signers on assignments and mortgage and lien releases.  As attorneys, Ms. Newman and Mr. Johnson would have known this was perjury.  Nonetheless, despite knowing no later than November 2009 that LPS committed rampant perjury, Ms. Newman and Mr. Johnson allowed LPS to file its Form 10Q with the SEC on November 16, 2009 without any disclosure whatsoever of the illegal document signing scheme.  Moreover, once the Company made a minimal and obtuse disclosure of the illegal document signing scheme, Johnson and Newman knowingly allowed LPS to issue false and misleading statements asserting the issue was isolated, immaterial, and remediated.  Their knowledge, as individuals responsible for the preparation and/or issuance of LPS's false and misleading statements throughout the relevant period, is attributable to LPS.

124.    The inference of scienter is also supported by the significant reforms LPS was forced to implement by government regulators, as set forth in the Consent Order entered into between Lender Processing Services, Inc., DocX, LLC, and LPS Default Solutions, Inc. and the Board of Governors of the Federal Reserve System, the Office of the Comptroller of Currency, the Federal Deposit Insurance Corporation and the Office of Thrift Supervision.  Under the Consent Order, LPS was required to conduct a document execution review to determine whether: (a) factual assertions made in mortgage documents executed by LPS and its employees were correct; (b) LPS had authority to execute mortgage documents on behalf of the servicers; (c) LPS' notarization practices were consistent with their attestations; (d) LPS-executed mortgage documents complied with legal requirements; and (e) LPS' practices and assertions resulted in financial harm to borrowers.  Based on this review, LPS was required to prepare a written report of its findings and submit a remediation plan. In addition, LPS was required to submit a plan to the Agencies to strengthen the board's oversight of default management services that LPS provides to servicers.  LPS also had to submit a compliance program addressing its compliance with legal requirements and enhance its internal audit program.  Additionally, LPS was required to retain an independent consultant to conduct a risk assessment of its default management services.

### D.    DocX Acted With Scienter

125.    DocX's scienter can be inferred from the strong inference of scienter pleaded as to Defendant Brown.  Defendant Brown was the chief executive of the DocX operations.  Brown was acting in furtherance of DocX's goals; *i.e.,* increasing profits.  Further, Defendant Brown furnished false information to LPS regarding the DocX subsidiary knowing such information would become the basis of LPS's false and misleading public statements.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

126.   The false and misleading statements set forth herein were widely disseminated to the securities markets, investment analysts, and to the investing public.  Those statements caused and maintained the artificial inflation of the price of LPS common stock, which consequently traded at prices in excess of its true value.

127.   Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine.  At all times relevant to this Complaint, the market for LPS common stock was an efficient market.  LPS common stock was actively traded on a highly efficient and automated market.  LPS filed periodic public reports with the SEC and was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports about the Company.  LPS regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace.  As a result, and which is empirically evident, the market for LPS equity securities promptly digested current information regarding LPS from all publicly-available sources and reflected such information in the LPS common stock price.

128.   Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Defendants' illegal scheme to falsify and fabricate mortgage related documents.

129.   Plaintiffs also read, or listened to, and relied on certain of Defendants' materially false and misleading statements prior to purchasing LPS common stock at artificially inflated prices.  Plaintiffs specifically read and relied upon Defendants' false and misleading statements pertaining to, among other things, the Company's purported technological advantage to aid servicers, the Company's publicly reported financial results, adequacy of internal controls, compliance with

pertinent regulations and legal requirements, any investigations, and the scope of reported inaccuracies in documents produced by LPS.

130.     Plaintiffs specifically read (and/or listened to) and relied upon the false and misleading statements alleged herein at ¶¶134-230, which include the false and misleading statements contained in (i) LPS's public press releases, as alleged herein; (ii) LPS's SEC filings on Forms 10-Q and 10-K filed with the SEC, as alleged herein; (iii) LPS's analyst conference calls alleged herein; and (iv) various direct communications between Defendants and Plaintiffs.

131.     Throughout the relevant period, Defendants issued statements in press releases and SEC filings that were false and misleading for the reasons set forth in ¶¶24-125, *supra*.

132.     The Relevant Period begins on August 6, 2008, the first trading day after LPS reported its second quarter 2008 financial results and held a conference call with analysts after the market's close on August 5, 2008.  Defendants' illegal falsification and fabrication of mortgage related document predates the relevant period, and artificial inflation in the stock price predates the relevant period.

133.     Throughout the relevant period, Defendants repeatedly highlighted the Company's growing revenues attributable to default services, indicating this would turn into earnings and cash flow in the future.  As set forth in the Company's Form 10-K filed with the SEC on March 16, 2009:

> Historically, some of our default management businesses have had lower margins than our loan facilitation businesses.  However, as our default volumes have increased, our margins have improved significantly on the incremental sales in 2007 and 2008.  Because we are often not paid for our default services until completion of the foreclosure, default does not contribute as quickly to our cash flow from operations as it does to our revenues.

**Second Quarter 2008 Earnings Release and Conference Call**

134.    On August 5, 2008, LPS reported issued a press release stating: "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage industry, today reported consolidated and combined revenues of $460.4 million for second quarter 2008, an increase of 8.3% compared to second quarter 2007, and net earnings of $63.5 million compared to $60.5 million in the prior year quarter." The press release was concurrently filed on Form 8-K with the SEC. The Company attributed the financial results to "strong market growth and our ability to continue to gain market share."

135.    William P. Foley, II ("Foley"), Chairman of the LPS Board of Directors, declared: "Second quarter results were very strong despite difficult market conditions and overall weakness in the economy. LPS, with its solid market position and unique capabilities, remains well-positioned as a stand-alone public company to grow in the second half of 2008 and beyond."

136.    Carbiener added, "Overall, earnings were in line with our expectations. Strong results in our Default Services business more than offset a decline in our Loan Facilitation business." He concluded, "We're off to a strong start as an independent public company and while the broader economic environment and the real estate market in particular, remain challenging, LPS with its unique mix of businesses is well-positioned for the future."

137.    Also on August 5, 2008, LPS hosted a conference call with various securities analysts to discuss second quarter 2008 financial results. Carbiener and Chan participated in this call. Carbiener started by highlighting LPS's continued excellent results due to its default services business and strong positioning in that segment:

- Carbiener noted that, despite a sluggish economy and a challenging mortgage market, "LPS is unique [sic] well positioned to offer solutions to lending

institutions to help them through this period and in fact enable them to realize much sought-after efficiencies and cost savings."

- Carbiener boasted that LPS's "comprehensive suite of default management services enables us to manage the outsourcing of these services and deliver meaningfully efficiencies to our customers." He further touted LPS's expanded market share across all default product lines, leveraged by "market-leading positions in desktop and foreclosure services" and tight integration of other services (such as default title and REO management) into LPS's core technology platforms, which lead to "a number of agreements including new of [sic] expanded default title agreements with three of the nation's top lenders" during the second quarter. He added, "Bottom line, our ability to enable customers to complete services more easily, quickly, and less expensively, creates a win-win situation."

- Carbiener touted LPS's year-over-year revenue growth in default services (89.7%) driven by accelerating foreclosure activity and "increasing demand for our services that support all activities over the foreclosure and REO life cycle." He added that LPS stood to benefit from "challenges in the mortgage industry" and was well-positioned for long-term growth in its Loan Transaction Services segment (including anticipated 2008 growth in the low-to-mid teens) due to long-term origination, refinance, and default trends as well as expected market share gains.

138.     Chan echoed these sentiments during the conference call:

- Chan highlighted increased year-over-year revenues in LPS's Loan Transaction Services segment and default services business (14.4% and 89.7%, respectively), as well as increased year-over-year consolidated revenues of 8.3%.

- Chan emphasized strong customer demand for LPS's services, the expansion of LPS's "market-leading presence," and the benefits of LPS's "highly diversified model" that would enable LPS to grow despite difficult economic conditions. He added that "as Jeff [Carbiener] noted, market trends and dynamics, such as continued flight to quality, a trend to outsource, centralized lending, and a need for lenders to lower internal costs will continue to benefit us."

- Chan expressed confidence "that we are well positioned to perform better than the market metrics, and will continue to grow when the market stabilizes. On the default services side, we are well positioned to expand our growth." He added, "As we have noted in the past, based on our current projections, demand for our outsourced default services is expected to remain strong over the next few years."

**Second Quarter 2008 Form 10-Q**

139.    On August 13, 2008, LPS filed its quarterly report for the second quarter of 2008 on Form 10-Q for the period ending June 30, 2008.  The Form 10-Q reaffirmed the financials announced in the August 5, 2008 press release and conference call.

140.    Further, the second quarter 2008 Form 10-Q attributed the Company's financial results to "strong market growth as well as continued market share gains."

141.    Carbiener and Chan signed SOX certifications that falsely stated the second quarter 2008 Form 10-Q did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" and that "the financial statements, and other financial information included in [the 2008 Form 10-Q], fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."  Moreover, they falsely certified that based on their most recent evaluation of internal control over financial reporting, they had disclosed "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information" and "any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

142.    Defendants also made the following statements about LPS's disclosure controls and procedures:

> As of the end of the period covered by this report, we carried out an evaluation, under the supervision and with the participation of our principal executive officer and

- 43 -

principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) under the Exchange Act.  Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures are effective to provide reasonable assurance of timely alerts to material information required to be included in our periodic SEC reports.

143.    Defendants' statements in the 2008 second quarter Form 10-Q and the August 5, 2008 press release and earnings conference call set forth above were materially false and misleading when made for the reasons set forth in §§IV and V, more specifically because: (a) throughout the relevant period, LPS's earnings and revenues were artificially inflated by the use of illicit practices that enabled the Company to process a greater volume of mortgage related documents at lower cost without regard for accuracy and while exposing the Company to significant risk; (b) to push through the volume of work created by LPS's business model, LPS employed myriad illicit business practices at its various locations, including the fabrication of documents, robo-signing, surrogate signing, improper notarization, and the violation of security protocols; (c) LPS created a culture which valued speed over accuracy and led to significant errors in the default services it provided; (d) such errors were knowingly concealed from clients, attorneys, and courts; (e) as a result of these illicit practices, Defendants caused significant numbers of deficient, erroneous, and otherwise fraudulent documents to be filed with county records offices and courts nationwide; (f) as a result of Defendants' schemes, LPS's earnings revenues and other financial metrics were artificially inflated; (g) LPS's Forms 10-Q and 10-K failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material effect on LPS's product sales, revenues, net income, accounts receivable, and gross profit margins as required by Item 303 of Regulation S-K; and (h) for the reasons detailed herein, the SOX certifications Defendants signed by and incorporated in LPS's Forms 10-Q and 10-K were false.

**Third Quarter 2008 Earnings Release and Conference Call**

144.    On October 29, 2008, LPS issued a press release stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage industry, today reported consolidated revenues of $472.7 million for third quarter 2008, an increase of 11.1% compared to third quarter 2007, and net earnings of $51.3 million or 54 cents per share."  The press release was concurrently filed with the SEC on Form 8-K.  LPS attributed the reported financial results to "strong growth in the default market and our ability to continue to expand market share."

145.    Foley further boasted:  "LPS had strong results in its first quarter as a stand-alone company despite challenging market conditions and a difficult macro-economic environment affecting some of its businesses.  With its strong market position and unique capabilities, LPS remains well-positioned to grow in the fourth quarter and beyond."

146.    Carbiener falsely and/or misleadingly stated the Company enjoyed "[c]ontinued strong results in our Default Services business [that] more than offset a decline in our Loan Facilitation services" and added that, despite continued challenges in the broader economy and real estate market, "LPS has a strong presence in each of its markets and remains well positioned to grow profitably."

147.    During the October 29, 2008 conference call, Defendant Carbiener touted the capabilities and importance of the default solutions division:

> Default services more than made up for the decline in loan facilitation services as revenues grew 97.1% compared to last year driven by the strong growth in foreclosure volumes and increasing demand for our services to support all activities over the foreclosure and REO life cycle, especially in the area of REO asset management.  Clients in this environment are facing significant pressure to manage accelerating foreclosure and REO activity in a timely and cost efficient manner.  Our

comprehensive suite of default management services enables us to manage the outsourcing of these services and deliver meaningful efficiencies to our customers.

Additionally, by leveraging our market-leading positions in desktop and in foreclosure outsourcing, coupled with the tight integration of our other services like default title and REO asset management into our core technology platforms, we have continued to expand our market share across all of our default product lines. Specifically during the quarter we signed four deals that should generate approximately $10 million in annual revenues once fully implemented.

148.    Chan made similar comments during his opening remarks:

- Chan announced that year-over-year default services revenues were $241.8 million, a 97.1% increase, and that "foreclosures nationwide increased, and coupled with strong demand for our services, we continue to expand our market-leading presence."

- Regarding default services, Chan stated, "we remain well positioned to expand our growth both in depth and breadth of our offerings" and, due to ongoing customer challenges and pressure to manage accelerating foreclosures and REO assets owned, "the demand for our outsourced default services is expected to remain strong over the next few years."

- Chan emphasized LPS's "diversified end-to-end model that we believe will enable us to grow during this difficult market and economic environment as well as the various cycles of the industry."

**Third Quarter 2008 Form 10-Q**

149.    On November 14, 2008, LPS filed its quarterly report for the third quarter of 2008 on Form 10-Q for the period ending September 30, 2008.  The third quarter 2008 Form 10-Q reaffirmed the financials announced in the October 29, 2008 press release and conference call.  Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan.  Moreover, the third quarter 2008 10-Q attributed revenue and earnings performance "to strong market growth as well as continued market share gains" in LPS's default services unit.

150.    The foregoing statements regarding the third quarter 2008 results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶ 143.  In particular, LPS did not have "unique capabilities" that enabled the Company to grow market share, but rather cut corners to meet customer demand without regard for legal requirements.  LPS was not providing "meaningful efficiencies" to customers, it was fabricating documents.  These "efficiencies" and "unique capabilities" were only achieved by violating the law.  LPS's earnings were likewise not sustainable, or at least highly risky, as the earnings were inflated by Defendants' illegal practices and did not reflect the true costs of running the business in compliance with the law, or the true costs of mitigating the damage caused by the illegal activities.

**Fourth Quarter and Fiscal Year 2008 Earnings Release and Conference Call**

151.    On February 11, 2009, LPS issued a false and misleading press release stating: "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage industry, today reported consolidated revenues of $476.1 million for the fourth quarter of 2008, an increase of 8.5% compared to the fourth quarter of 2007, and net earnings of $54.3 million or 57 cents per share."  The press release was filed concurrently with the SEC on Form 8-K.  LPS attributed its financial results "to continued strength in the default market and our ability to gain market share."  LPS also noted that overall operating income for the Loan Transaction Services segment grew ($82.9 million, or 14.8%, compared to fourth quarter 2007) due to "higher income in Default Services."

152.    Foley declared, "LPS had a solid fourth quarter despite continued difficult market conditions and a tenuous macro-economic environment impacting some of its businesses.  LPS, with its unique capabilities and market leading presence, remains well positioned to achieve its growth objectives in 2009 and beyond."  Carbiener made similar comments, noting that "[w]e had a strong

finish in 2008 . . . and remain[] well-positioned to grow earnings in 2009."  Carbiener added, "Our Default Services business continued to deliver strong results which more than offset a decline in our Loan Facilitation Services."

153.    Also on this date, LPS held an earnings conference call with various securities analysts to discuss fourth quarter 2008 and 2008 fiscal year-end financial results.  Carbiener and Chan participated in this conference call.  Carbiener reiterated the strong performance and outlook of LPS's default services and LPS's ability to leverage "market leading positions" in Desktop technology and foreclosure outsourcing:

- Carbiener touted solid revenue growth "driven by continued strong performance in default services" and anticipated "increasing demand for our services to support all activities over the foreclosure and REO lifecycle." Carbiener projected 2009 revenue growth in the range of 11% to 13%, driven in part by "continued market share gains" and "default volumes."

- Carbiener also boasted the expansion and leveraging of LPS's default services and Desktop platform: "Outside of MSP, we continued to see strength in the desktop sales pipeline, driven by opportunities in default as well as opportunities to expand the desktop platform into other areas in the Lender's origination and servicing operation."   Carbiener also touted expanded market share "across all of our default product lines" (including the signing of "eight deals that should generate approximately $5 million in 2009 revenues") as a result of "leveraging our market leading positions in desktop and in foreclosure outsourcing and the integration of our other services like default title and REO asset management."   Carbiener added, "These dynamics combined with our market leading products position us well for continued profitable growth."

154.    Chan echoed these comments during his opening remarks:

- Chan touted increasing demand for LPS's services and the successful expansion of "our market leading presence even in these difficult times."  He added that LPS's "diversified end to end model" would "enable to us grow during this difficult market and economic environment as well as the various cycles of the industry."

- With respect to LPS's default services, Chan announced a 68.3% increase ($243.7 million) in revenues over the prior year and projected "solid" 2009

growth.  He stated that LPS was "focused on greater penetration of our current [default services] offerings and continued expansion of our technology and product capabilities."  He added that "the demands for outsource default services is expected to remain strong over the next few years."

155.    In the following question-and-answer session, Chan again highlighted the market share potential for default services, stating that "as we've shown in last quarter we really don't need foreclosure starts for to us grow our revenue" and that LPS would "continue to sell downstream and be able to pick up additional market share" across LPS's "series of default products."

**Fiscal Year 2008 Form 10-K**

156.    On March 16, 2009, LPS filed its annual report for its fiscal year ended December 31, 2008 on Form 10-K.  The Form 10-K reaffirmed the financial results announced in the February 11, 2009 press release and conference call.  Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan.  Moreover, the Form 10-K touted, among other things, the growth and market share of LPS's Loan Transaction Services segment and default management services business, the range and quality of its default management services, and increased revenues and margins in its default management services business:

- LPS compared revenue figures from 2006 through 2008 to demonstrate the extent to which rising default management revenues can offset declines in loan facilitation revenues.  LPS also noted that "*as our default volumes have increased, our margins have improved significantly* on the incremental sales in 2007 and 2008."  LPS further touted the growth of its default management services as follows: "Based in part on *the range and quality of default management services* we offer and our focus on customer service, our default management business has grown significantly and we are now the largest mortgage default management outsourced service provider in the U.S."

- LPS disclosed increased consolidated processing and services revenues in 2008 (an increase of $171.3 million, or 10.1%, compared to 2007) "primarily

driven by growth in our Loan Transaction Services segment which resulted from growth in default services . . . .  Additionally, the increase was supported by growth in our Desktop application and applied analytics services."  LPS made similar comments with respect to an increase in consolidated revenues from 2006 to 2007.

- LPS also disclosed increased processing and services revenues for the Loan Transaction Services segment in 2008 (an increase of $181.9 million, or 16.2%, compared to 2007) "primarily driven by our default management services due to strong market growth as well as continued market share gains."  LPS made similar comments when comparing an increase in the segment's revenues from 2006 to 2007.

157.   The foregoing statements regarding the fourth quarter and full-year 2008 results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150.  In particular, the assertion that "our margins have improved significantly" as "our default volumes have increased" was false and misleading because, among other things, Defendants employed low-skilled workers to robo-sign thousands of documents without regard to accuracy or legality.  Had Defendants complied with legal requirements, the costs of doing business would have hurt margins as default volumes increased.

**The April 16, 2009 Dow Jones Daily Bankruptcy Review Article and Response**

158.   On April 16, 2009, *the Dow Jones Daily Bankruptcy Review* published an article detailing an Order issued by The Honorable Bankruptcy Judge Diane Weiss Sigmund, concerning the accuracy of documents filed in her Court by parties using LPS's services.  The article, which is quoted at ¶ 89, asserted LPS's system jeopardized accuracy to achieve cost savings and efficiency.

159.   The following day, April 17, 2009, LPS issued a press release that was false and misleading.  The press release stated:

The Honorable Diane Weiss Sigmund issued an opinion on April 16, 2009, with respect to the Niles C. Taylor and Angela J. Taylor proceeding, in which the activities of the participants in the case were reviewed.  LPS was not a party to this case.  LPS, however, voluntarily demonstrated the use of its system for Judge

- 50 -

Sigmund and provided all information requested by the U.S. Trustees Offices in connection with this case.  In Judge Sigmund's opinion issued at the conclusion of the proceeding, Judge Sigmund stated that LPS was not responsible for any errors in the conduct of the case.

160.    Defendants knew the April 17, 2009 press release was false and misleading.  Judge Sigmund highlighted anecdotal evidence of systemic problems with LPS's systems – and it was wrong to suggest LPS did not cause any errors to be filed with the Court.  Despite the technical ruling of Judge Sigmund on the matters before her, it was highly misleading to assert that LPS had no responsibility in the creation of the false documents at issue in that specific case – or, for that matter, more generally.

**First Quarter 2009 Earnings Release and Conference Call**

161.    On April 29, 2009, LPS issued a press release stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage industry, today reported consolidated revenues of $529.8 million for the first quarter of 2009, an increase of 19.4% compared to the first quarter of 2008, and net earnings of $50.0 million or 53 cents per share."  The press release also noted that "[o]verall operating income for the segment grew due to higher income in Default Services."  The press release was filed concurrently with the SEC on Form 8-K.

162.    Carbiener highlighted the success of Default Services, which "continued to deliver strong results which more than offset a decline in our Loan Facilitation Services."  He also announced that LPS was "off to a solid start in 2009," had "a strong presence in each of its businesses and remains in a good position to grow earnings in 2009," and expected revenues to "grow 13%-15% compared to 2008 and adjusted earnings to come in at the higher end of the $2.64-$2.74 per diluted share guidance."

163.    Also, on April 29, 2009, LPS hosted an earnings conference call with analysts to discuss first quarter 2009 financial results.  Carbiener and Chan participated in the call.  Carbiener misleadingly downplayed the recent Dow Jones Daily Bankruptcy Review article discussing the U.S. Trustee's probe into LPS and misleadingly assured investors that LPS's systems were fully compliant with pertinent law and the concerns raised by the Bankruptcy Judge were ***not*** indicative of a systemic problem:

- Carbiener claimed the Dow Jones Daily Bankruptcy Review article contained many statements that were either "incorrect or taken significantly out of context," and that its purpose was to "***sensationalize*** the participation of the US Trustee" in the *Taylor* case.

- Carbiener insisted that "there is no nationwide investigation of LPS by the Department of Justice.  And based upon conversations between our outside counsel and the US Trustee's office, we have ***no reason to believe*** that the US Trustee is conducting any type of nationwide investigation of LPS."

- Carbiener asserted that LPS "voluntarily provided unprecedented access regarding the use of our system" to the Trustee and the Court, and that, after observing LPS's system demonstration and various documents, "***the judge fully exonerated LPS*** in *Taylor* and the US Trustee's office has confirmed to LPS that their review of our contact in this case is over."  He assured the market that "[a]s far as we are concerned, ***this matter is concluded***."

164.    Carbiener also commented positively on LPS's first quarter financial results and future prospects, particularly with respect to increasing revenues and market share in its default services business:

- Regarding LPS's Default Services, Carbiener touted "strong 51% revenue growth," "increasing demand for our services that support all activities over the foreclosure and REO lifecycle," and continued expansion of market share "across all of our default product lines" resulting from the leveraging of "our market-leading positions in desktop and in foreclosure outsource, and the integration of our other services, like default title and REO asset management."  As evidence of such market share expansion, Carbiener referenced deals signed during the prior quarter that "should generate approximately $30 million in annualized revenues."

- 52 -

- Carbiener also announced that LPS was "increasing our expectations for full year of 2009 revenue growth to a range of 13% to 15%" driven in part by "continued market share gains," "penetration of new products," and "origination and default volumes." He added that "LPS is well-positioned to not only weather these challenging times, but in fact benefit from them" and projections of profitable growth and "*above-average returns to shareholders in 2009 and beyond*" are due to LPS's "strong market position" and "balanced portfolio."

165.     Chan made similarly positive comments during his opening remarks:

- Chan touted Default Services revenues of $255.3 million, a 51% increase compared to the first quarter of 2008. He added, "We continue to expand our depth and breadth of our service offerings, and when coupled with some of the recent lifting of direct and indirect foreclosure moratoria, we expect to expand our market-leading presence."

- Chan noted that "the demand for our outsourced default services is still expected to remain strong over the next few years" given the dynamics surrounding accelerating foreclosures and REO assets owned.

**First Quarter 2009 Form 10-Q**

166.     On May 13, 2009, LPS filed its quarterly report for the first quarter of 2009 on Form 10-Q for the period ending March 31, 2009. The first quarter 2009 Form 10-Q reaffirmed the financial results announced in the April 29, 2009 press release and earnings conference call. Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan.

167.     Moreover, the first quarter 2009 10-Q contained the following statements touting the growth and financial success of LPS's default management services business, which in turn led to increased revenues from LPS's Desktop services:

- LPS compared revenue figures to "demonstrate the extent to which rising default management revenues can offset declines in loan facilitation revenues." It added that, "*as our default volumes have increased, our margins have improved significantly on the incremental sales during the first quarter of 2008 and 2009.*"

- LPS reported increased year-over-year processing and services revenues both on a consolidated basis ($86.2 million, or 19.4%) and within its Loan Transaction Services segment ($63.4 million, or 20.4%) during the first quarter of 2009. Regarding consolidated revenues, LPS stated that "[t]he increase was primarily driven by growth in our Loan Transaction Services segment which resulted from growth in default services." Regarding Loan Transaction Services revenues, specifically, LPS attributed the increase primarily to "growth in our default management services due to strong market growth as well as continued market share gains."

168.    Concerning regulatory matters, LPS generically disclosed that it received from time-to-time "inquiries and requests for information from various state and federal regulatory agencies" (including informal or formal requests or civil investigative subpoenas) due to "the heavily regulated nature of the mortgage industry."  LPS assured the market, however, "[w]e do not expect that any such inquiries would have a material adverse effect on our financial condition or our ability to operate our businesses."

169.    For the reasons stated in §§IV and V, and as detailed herein including ¶143, the statements made in the 2009 first quarter Form 10-Q and the April 29, 2009 press release and earnings conference call set forth above, which touted, among other things, LPS's strong financial results, growth in default services revenue leading to "above-average returns to shareholders," that LPS's systems had been "fully exonerated" and there was no basis for any investigation, the quality of default management services, and expanding market share, were materially false and misleading when made or omitted material facts to make such statements not false or misleading.

**Second Quarter 2009 Earnings Release and Conference Call**

170.    On July 29, 2009, LPS issued a press release stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $613.2 million for the second quarter of 2009, an increase of 35.3% compared to the second quarter of 2008, and net earnings of $75.2

million or 78 cents per diluted share." In the release, Kennedy declared, "LPS had a very strong second quarter despite a challenging macroeconomic environment. LPS, with its comprehensive end-to-end solutions for the mortgage and real estate industries, remains well positioned for an outstanding year in 2009 and to continue to grow profitably in 2010 and beyond." Added Carbiener, "Second quarter earnings were very solid across all our businesses. Our Default Services business continued to deliver strong results while our Loan Facilitation Services benefitted from the improved origination environment."

171.    LPS further reported increases in revenues from its Loan Transaction Services segment ($448.0 million, or 42.1%) and its Default Services business ($299.5 million, or 51.9%) compared to the second quarter of 2008. LPS attributed the Default Services gains primarily to "ongoing strength in the default market and our ability to continue to gain market share." LPS also reported higher overall operating income from the Loan Transaction Services segment due in part to higher income "across all major services in Default."

172.    On the following day, LPS hosted an earnings conference call with analysts. Carbiener and Chan participated in this call. Carbiener began his opening remarks by reiterating LPS's success and future prospects, particularly with respect to increasing revenues and market share in the Loan Transaction Services segment and default services business:

- Carbiener announced that overall financial performance in the second quarter "exceeded our expectations," with revenue growth "favorably impacted by increasing year-over-year foreclosure and origination volumes, stable loan servicing accounts and increasing market share across all segments." He attributed this to strong demand, and stated that LPS was well-positioned to grow its top and bottom line.

- Carbiener noted a 42.1% year-over-year increase in second quarter Loan Transaction Services revenue, attributed to strong Default Services revenue growth (51.9%) and increased demand for LPS's services supporting "all activity over the foreclosure and REO lifecycle."

- 55 -

- Carbiener also touted expanded market share across all default product lines "by leveraging our market-leading positions in desktop, and in foreclosure outsourcing and the integration of our other services."  Specifically, he noted second quarter deals expected to generate approximately $17 million in annualized revenues.  Carbiener projected such market expansion to continue, given that LPS was "just starting to drive penetration in many of the Default Services we offer."

173.    Chan's opening remarks were similarly optimistic, citing increased year-over-year consolidated and default services revenues (35.3% and 51.9%, respectively) and "strong growth results from our comprehensive, diversified and balanced business model, reflecting significant contributions from both of our operating segments" that will "enable us to grow during this difficult market and economic environment as well as the various cycles of the industry."  Chan projected growth in the low-to-mid teens and the potential for continued market and product penetration by "leveraging our market-leading technology presence to expand utilization of our comprehensive and integrated default offerings and continuing to provide our customers with a more robust integrated solution that also provides them with better processing transparency."

174.    Carbiener further extolled the opportunities in LPS's Default Services business ("So we feel good about our opportunities for -- in Default.").  He projected strong default volumes through 2011 and LPS's ability to gain "more market share in each of the [default services] products I talked about, not just relying on the fact that foreclosure starts were going to be increasing."  Carbiener also touted LPS's ability to leverage its Desktop system to gain business:  "The fact that we are able to see better than 50% of the foreclosure starts that occur in this country, because they do flow into that desktop technology and we manage those processes, we have gotten a hold of those transactions."  He elaborated as follows: "[W]e also view our workflow technology that's desktop technology as being a solid tool to use throughout the servicing organization. . . .  And by going after

the foreclosure side, what we were able to do was gain credibility that we could ***put together a good, solid business case and business model for what our systems can do and just how much cost they can take out*** of a department by automating the various processes that occur within departments. . . . So we are seeing tangible results from pushing these technologies into these other areas."

175.    Carbiener also dismissed any ongoing concerns regarding a federal investigation into LPS.  When asked, "Is there any change in the DOJ investigation, or should we just presume this is completely behind us now?"  Carbiener responded, "I don't even remember that."

176.    Defendants misleadingly highlighted increased margins, particularly in the default services unit, contributed to higher earnings without disclosing that those margins were achieved by cutting costs by hiring temporary employees to robo-sign documents.  Defendant Carbiener stated: "Operating margins year-over-year were actually up 140 basis points. . . . The increases in operating income and operating margins were driven by margin expansion in both of our key business segments."  Defendant Chan stated:  "The default margins remained strong and expanded on a sequential-quarter basis. . . . [W]e are extremely pleased with our operating margins."

## Second Quarter 2009 Form 10-Q

177.    On August 14, 2009, LPS filed its quarterly report for the second quarter of 2009 on Form 10-Q for the period ending June 30, 2009.  The second quarter 2009 Form 10- Q reaffirmed the financial results announced in the July 29, 2009 press release and July 30, 2009 conference call.  Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan.  Moreover, the second quarter 2009 10-Q depicted LPS's financial results in a positive light, highlighting increased revenues, margins, demand, and market share in its default management services business:

- PS touted rising default management revenues, the ability of such revenues to offset potential declines in loan facilitation revenues, and default management margins that "have improved significantly on the incremental sales during the first six months of 2008 and 2009."

- LPS reported increased year-over-year processing and services revenues both on a consolidated basis ($159.9 million, or 35.3%) and within its Loan Transaction Services segment ($132.7 million, or 42.1%) during the second quarter of 2009. Regarding consolidated revenues, LPS stated that "[t]he increase was primarily driven by growth in our Loan Transaction Services segment resulting from increased demand for our services that support the default life cycle." Regarding Loan Transaction Services revenues, specifically, LPS stated that the increase was "primarily driven by growth in our default management services due to strong market growth and continued market share gains." LPS also reported increased year- over-year processing and services revenues both on a consolidated basis ($246.1 million, or 27.4%) and within its Loan Transaction Services segment ($196.2 million, or 31.3%) during the first six months of 2009, citing factors similar to those driving the second quarter 2009 gains.

178.    The Form 10-Q also allayed any concerns over regulatory inquiries or investigations concerning LPS.  LPS generically disclosed that it received from time-to-time "inquiries and requests for information from various state and federal regulatory agencies" (including informal or formal requests or civil investigative subpoenas) due to "the heavily regulated nature of the mortgage industry."  However, LPS assured the market:  ***We do not expect that any such inquiries would have a material adverse effect on our financial condition or our ability to operate our businesses***."

179.    The foregoing statements regarding the second quarter 2009 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150, 157, 169.  In particular, the assertion that "increases in operating income and operating margins were driven by margin expansion" was false and misleading because, among other things, Defendants employed low-skilled workers to robo-sign thousands of documents without regard to accuracy or legality.  Had Defendants complied with legal requirements, the costs of doing business would have

hurt margins as default volumes increased.  Similarly, the assertion that LPS was able to take cost

out of a servicer's business was false and misleading because these cost savings were premised on

illegal and improper business practices that cut costs but exposed the servicers and LPS itself to

significant legal and financial risk.

**Third Quarter 2009 Earnings Release and Conference Call**

180.    On October 22, 2009, LPS issued a press release stating:  "Lender Processing

Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage

and real estate industries, today reported consolidated revenues of $619.4 million for the third

quarter of 2009, an increase of 32.7% compared to the third quarter of 2008, and net earnings of

$75.5 million or 78 cents per diluted share."  This press release was filed concurrently on Form 8-K

with the SEC.  LPS attributed the Default Services gains primarily to "ongoing strength in the

default market and our ability to continue to gain market share."  LPS also reported higher overall

operating income from the Loan Transaction Services segment due in part to higher income from

Default Services.

181.    In the release, Kennedy highlighted that "LPS delivered strong results in the third

quarter despite an ongoing difficult business environment.  LPS with its broad-based, technology-

driven end-to-end solutions for the mortgage and real estate industries, remains well positioned for

the fourth quarter and to continue to grow profitably in the years ahead."

182.    Carbiener echoed Kennedy's sentiments, stating that "our Default Services business

continued to deliver very strong results" and "LPS with its solid market presence remains well

positioned for a strong finish in 2009 and to continue to grow revenue and earnings in 2010."

183.    On October 23, 2009, LPS held a conference call with various securities analysts to

discuss LPS's third quarter 2009 financial results.  Carbiener and Chan participated in this call.

Carbiener opened the call by touting "exceptionally strong" revenue growth, strong demand, and increasing market share largely attributable to LPS's default services business:

- Carbiener stated that "demand for our solutions remains strong and that we are well-positioned to continue to grow our top and bottom line," citing revenue growth favorably impacted by increasing year-over-year foreclosure and origination volume, growing loan servicing counts, and increasing market share across all segments.

- According to Carbiener, third quarter revenues in the Loan Transaction Services segment were 33.7% above the prior year based on strong growth in both Default Services and Loan Facilitation Services.  Default Services finished with a "very strong" revenue growth rate of 25.6%, noting increasing demand for all activities over the foreclosure and REO lifecycles.

- Carbiener expressed confidence that "market revenues will remain significant and that we are well-positioned to grow our approximate 20% marketshare," noting that "we are just starting to drive penetration in many of the Default Services we offer."  As in prior earnings calls, Carbiener spoke of LPS's opportunity to "leverage our 50% marketshare in Desktop and our integrated offerings to increase penetration across all default-related product lines."

- Carbiener announced that, as a result of LPS's strong results and growth expectations, adjusted earnings per share guidance was increased to a range of $3.07 to $3.09 per diluted share for full year 2009.

184.    Defendant Chan highlighted the Company's continued high margins – but failed to disclose that those high margins were achieved by illegal business practices:  "The Default Services margin[s] remained strong . . . .  In summary, we are pleased with our operating margins."  Similarly, Defendant Carbiener answered a question from a Goldman Sachs analyst regarding reported margins and indicated the Company was very focused margins in the Default Services unit and keeping those margins high.

185.    Chan further boasted of continued market share gains in LPS's default services business:

- Chan noted that, despite a more challenging environment for foreclosures, LPS "continued to gain marketshare through both customer and additional product

wins." He credited such favorable results to "the comprehensive, diversified and balanced business model that we believe will enable us to grow during this difficult market and economic environment, as well as the various cycles of the industry."

• Chan announced that year-over-year Default Services revenues increased ($303.8 million, or 25.6% increase) and that Default Services was expected to "remain strong" over the next few years (with projected growth in the low 20% range) due to increased total foreclosure market revenues and "our continued pursuit to expand both our marketshare and product penetration.  These efforts include leveraging our market-leading technology presence to expand utilization of our comprehensive and integrated Default offerings."

**Third Quarter 2009 Form 10-Q**

186.    On November 16, 2009, LPS filed its quarterly report for the third quarter of 2009 on Form 10-Q for the period ending September 30, 2009.  The third quarter 2009 Form 10-Q reaffirmed the financial results announced in the October 22, 2009 press release and the October 23, 2009 conference call.  Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan.  Moreover, the third quarter 2008 10-Q touted LPS's financial success, particularly fueled by increased revenues, margins, and market share in its default management services business:

• LPS stated that its default management services provided a "natural hedge" against real estate volatility because a weaker economy tends to increase the volume of consumer mortgage defaults, thereby benefitting LPS's default management services business.  LPS noted that its Desktop services also benefitted from a weaker economy given that the Desktop application was primarily used in connection with default management.

• LPS stated that, as its default volumes have increased, "***our margins have improved*** significantly on the incremental sales during the first nine months of 2008 and 2009."

• LPS reported increased year-over-year processing and services revenues both on a consolidated basis ($152.6 million, or 32.7%) and within its Loan Transaction Services segment ($111.0 million, or 33.7%) during the third quarter of 2009.  Regarding consolidated revenues, LPS stated that such increase was "primarily driven by growth in our Loan Transaction Services segment resulting from

increased demand for our services that support the default life cycle." Regarding Loan Transaction Services revenues, specifically, LPS stated that the increase was "primarily driven by growth in our default management services due to strong market growth and continued market share gains." LPS also reported increased year-over-year processing and services revenues both on a consolidated basis ($398.7 million, or 29.2%) and within its Loan Transaction Services segment ($307.2 million, or 32.1%) during the first nine months of 2009, citing factors similar to those driving the third quarter gains.

187.    Further, in reference to regulatory inquiries and investigations, Defendants unequivocally stated:  "We do not expect that any such inquiries will have a material adverse effect on our financial condition or our ability to operate our businesses."

188.    The foregoing statements regarding the third quarter 2009 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150, 157, 169, 179.  In particular, LPS's revenue, income and margin numbers were false and misleading because, among other things, Defendants employed low-skilled workers to robo-sign thousands of documents without regard to accuracy or legality.  Had Defendants complied with legal requirements, the costs of doing business would have hurt revenues, income and margins.

**Fourth Quarter and Fiscal Year 2009 Earnings Release and Conference Call**

189.    On February 8, 2010, LPS issued a press release misleadingly stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $608.1 million for the fourth quarter of 2009, an increase of 28.3% compared to the fourth quarter of 2008, and net earnings of $74.9 million or 77 cents per diluted share."  The press release was filed concurrently on Form 8-K with the SEC.

190.    According to Kennedy, "LPS had a strong fourth quarter despite challenging market conditions and a fragile macro-economic environment.  LPS with its market-leading presence and its

unique technology-driven solutions for the mortgage and real estate industries, remains well positioned to achieve its growth objectives in 2010 and beyond."

191.    Carbiener continued, "Our Loan Facilitation business posted record growth as it benefitted from a better year-over-year origination market while our Default Services business continued to deliver very strong results."  He added that LPS had "an exceptional year in 2009" and was "well positioned to grow revenue and earnings in 2010" due to the strong presence in each of LPS's businesses.

192.    On the following day, February 9, 2010, Defendants hosted an earnings conference call with analysts to discuss LPS's fourth quarter 2009 and 2009 fiscal year-end financial results. Carbiener and Chan participated in this call.  Carbiener led the call reiterating LPS's successes and future prospects, particularly with respect to its default services business:

- Carbiener stated that LPS's full year 2009 results reflected its "continuing ability to drive market share gains in each of our primary business segments," including "default services which grew revenues at 33.5% despite nationwide foreclosure starts increasing an estimated 25% in 2009."

- Carbiener stated that fourth quarter revenue growth "was again exceptionally strong as consolidated revenues grew 28.3% [$134 million in absolute dollars] driven by solid performance in every business segment."  He attributed such growth to increasing foreclosure and origination volumes and "increasing market share across all segments," demonstrating that "demand for our solutions remain[ed] strong" and LPS was "well positioned to continue to grow our top and bottom line."

- Regarding the Loan Transaction Services segment, Carbiener announced year-over-year revenue growth of 28.7% for the fourth quarter of 2009 "as we experienced strong growth in both default services and loan facilitation services," reflecting a trend toward outsourcing and centralization of lending processes.  He maintained that LPS was "well positioned to drive greater product penetration within both new and existing customers," pointing to fourth quarter deals "that should generate approximately $5 million in annualized revenues."

- In the context of default services, Carbiener highlighted "revenue growth rate of 14.3% which was very strong" despite external factors that slowed foreclosure

starts and sales.  He touted "increasing demand for our services that support all
activities over the foreclosure and REO life cycles" and newly signed fourth
quarter deals "that should generate over $10 million in annualized revenues."

- Carbiener concluded his opening remarks by touting LPS's "unique portfolio"
  and "strong market position" in all businesses, predicting that LPS would
  continue to "grow profitably and deliver above average returns to shareholders in
  2010 and beyond."

193.    Defendant Chan misleadingly asserted, without disclosing that margins were
artificially inflated by illegal business practices:  "The default services margin remains strong. . . .  In
summary, we are pleased with our operating margins. . . ."

194.    Chan reinforced the "strong growth" of LPS's financials, noting a year-over-year
increase in consolidated revenues ($608.1 million, or 28.3%) reflecting "the balanced contribution
from each of our key business segments" (including a 28.7% revenue gain in the Loan Transaction
Services segment).  Regarding default services, in particular, Chan noted increased year-over-year
revenues of $278.6 million, or 14.3%, for the fourth quarter of 2009.

**<u>Fiscal Year 2009 Form 10-K</u>**

195.    On February 23, 2010, LPS filed its annual report for the fiscal year ending December
31, 2009 on Form 10-K.  The Form 10-K reaffirmed the 2009 fourth quarter and fiscal year-end
financial results announced in the February 8, 2010 press release and February 9, 2010 conference
call.  Further, it contained substantially the same SOX certifications that were included in LPS's
second quarter 2008 10-Q, which were also signed by Carbiener and Chan.  Moreover, the Form 10-
K described year-over-year increases in annual processing and services revenues generated by the
Loan Transaction Services segment ($401.1 million, or 31.3%, in 2009 and $209.5 million, or
19.5%, in 2008), which were "primarily driven by our default management services due to strong
market growth as well as continued market share gains."

196.    LPS also described the significant growth of its default management services, making LPS "now one of the largest mortgage default management services providers in the U.S." It attributed this in part to the "range and quality of default management services we offer and our focus on technology and customer service."

197.    The 2009 Form 10-K disclosed inquiries into the practices of LPS's DocX subsidiary by the U.S. Attorney's Office for the Middle District of Florida and the Clerk of Court of Fulton County, Georgia, and disclosed that "[r]ecently, during an internal review of the business processes used by [DocX], we identified a business process that caused an error in the notarization of certain documents, some of which were used in foreclosure proceedings in various jurisdictions around the country." At the same time, however, LPS explicitly assured investors that the problem was "immaterial to our financial results," "immediately corrected," "unrelated to our core default management services," and affected only a "limited number of customers." LPS also couched such governmental scrutiny as a mere function of "the heavily regulated nature of the mortgage industry" and the "current economic downturn and troubled housing market" resulting in scrutiny of "all parties" involved in the mortgage industry. LPS assured the market: "***We have since completed our remediation efforts with respect to the affected documents***. . . . We have expressed our willingness to fully cooperate with the U.S. Attorney. We continue to believe that we have taken necessary remedial action with respect to this matter."

198.    The foregoing statements regarding the third quarter 2009 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150, 157, 169, 179, 188. In particular, LPS's revenue, income and margin numbers were false and misleading because, among other things, Defendants employed low-skilled workers to robo-sign thousands of documents without regard to accuracy or legality. Moreover, the Company had not

completed its remediation efforts, the problem was not immaterial to the Company's financial results, and the error was not simply limited to notarizations.  The problem concerned over a million fraudulent documents filed in proceedings across the country.

199.    LPS's description of its business as providing "quality" default management services was a misrepresentation and/or omission as LPS was utilizing low-wage employees to robo-sign and/or fabricate massive numbers of documents without any regard to veracity, without being signed by the person purporting to sign the document, and without being legally notarized.  Since Defendants' default management services were intended for use in foreclosures and bankruptcy proceedings, the production of these documents did not come close to complying with the rigorous standards required.

**April 5, 2010 Press Release**

200.    On Saturday April 3, 2010, *The Wall Street Journal* published an article revealing that problems with foreclosure documents created by LPS were more widespread and blatant than LPS had previously indicated.  Moreover, according to sources who spoke with *The Wall Street Journal*, the investigation was a serious matter that was being pursued as a criminal inquiry:

> Judges across the U.S. have prevented foreclosures after finding that the materials banks had submitted to them to support their claims were wrong.
>
> Now a subsidiary of a company that is a top provider of the documentation to banks for foreclosure actions is under investigation by federal prosecutors.
>
> Prosecutors are "reviewing the business processes" of the subsidiary of Lender Processing Services Inc., based in Jacksonville, Fla., according to the company's annual securities filing released in February.  ***People familiar with the matter say the inquiry is criminal in nature.***
>
> * * *
>
> Some lawyers representing homeowners have claimed that banks ***routinely file erroneous paperwork showing they have a right to foreclose when they don't.***

Firms that process the paperwork are either "producing so many documents per day that *nobody is reviewing anything, even to make sure they have the names right, or you've got some massive software problem*," said O. Max Gardner, a consumer-bankruptcy attorney in Shelby N.C., who has defended clients against foreclosure actions.

LPS was recently referred to in a case involving Sylvia Nuer, a Bronx, N.Y., homeowner who had filed for bankruptcy protection in 2008.  Diana Adams, a U.S. government lawyer who monitors bankruptcy courts, said in a brief filed earlier this year that LPS signed a document that wrongly said J.P. Morgan Chase &Co. had once owned Ms. Nuer's loan.

Documents related to the loan were "*patently false or misleading*," she wrote.  J.P. Morgan Chase, which has withdrawn its request to foreclose, declined to comment.

* * *

LPS has acknowledged problems in its paperwork.  In its annual securities filing, in which it disclosed the federal probe, the company said it had found "an error" in how Docx handled notarization of some documents.  *Docx also has processed documents used in courts that incorrectly claimed an entity called "Bogus Assignee" was the owner of the loan, according to documents reviewed by* <u>*The Wall Street Journal.*</u>

Ms. Kersch said the "bogus" phrase was used as a placeholder. "*Unfortunately, on a few occasions, the document was inadvertently recorded before the field was updated*," she said.

201.    On April 5, 2010, prior to the market open, LPS issued a press release to counter the

article in *The Wall Street Journal*:

Lender Processing Services, Inc. (NYSE: LPS), a leading provider of integrated technology and services to the mortgage industry, today provided clarification to a recent article published by the Wall Street Journal.

As indicated in LPS' most recent Form 10-K, filed in February 2010, LPS reported that during an internal review of the business processes used by its document solutions subsidiary, the Company identified a business process that caused an error in the notarization of certain documents, some of which were used in foreclosure proceedings in various jurisdictions around the country.

The services performed by this subsidiary were offered to a limited number of customers, were unrelated to the Company's core default management services and

- 67 -

were immaterial to the Company's financial results. LPS immediately corrected the business process and has completed the remedial actions necessary to minimize the impact of the error.

\* \* \*

LPS continues to believe that it has taken necessary remedial action with respect to this matter.

202.    The foregoing statements regarding the fourth quarter and year-end 2009 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150, 157, 169, 179, 188, 198.  In particular, the Company had not completed its remediation efforts, the problem was not simply limited to notarizations, and the mistakes were not a "few occasions" or inadvertent.  As LPS would later admit, the problem was massive, intentional and concerned over a million fraudulent documents filed in proceedings across the country.

**First Quarter 2010 Earnings Release and Conference Call**

203.    On April 22, 2010, LPS issued a press release stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $592.4 million for the first quarter of 2010, an increase of 11.8% compared to the first quarter of 2009.  Net earnings of $72.5 million or 75 cents per diluted share in the first quarter of 2010 increased from $50.0 million or 53 cents per diluted share in the first quarter of 2009."  The press release was filed concurrently on Form 8-K with the SEC.

204.    Kennedy boasted, "LPS is off to a strong start in 2010 despite difficult market conditions and a challenging broader macro-economic environment.  LPS, with its strong market presence and its unique portfolio of services, remains well positioned to achieve its growth objectives in 2010 and beyond."

205.    Carbiener touted LPS's "strong start in 2010" and "good position to grow revenue and earnings in 2010" based on LPS's "market-leading presence in each of its businesses."  In particular, "[o]ur Default Services business grew year-over-year as well, despite being impacted by broader industry slowdowns."  He announced expected 2010 revenue growth of 8% to 10% based in part on "key customer wins in our Desktop business," "a solid run rate in March in Default Services," and "continued growth in foreclosure activity."

206.    On the next day, April 23, 2010, LPS hosted a conference call with securities analysts to discuss its first quarter 2010 financial results.  Carbiener and Chan participated in this call.  Carbiener began with encouraging remarks about LPS's growth, including in the Default Services business , which had "a revenue growth rate [of] 5.2%," "primarily driven by market share gains, along with an increase primarily in March in later-stage delinquency volumes."

207.    Chan proceeded with similar praise, noting "strong" growth in year-over-year revenues on a consolidated basis ($592.4 million, or 11.8%, due to "diverse and balanced contributions from each of our key business segments"), in the Loan Transaction Services segment (10.9%), and in the Default Services business ($268.7 million, or 5.2%, "primarily the result of market share gains as we continue to offer timely solutions").  He noted that, despite decreased foreclosure starts, "we are encouraged by the improving [Default Services] volume trends and the related positive impact on margins, especially going into the second quarter."

208.    Defendant Chan highlighted the Company's continued high margins – but failed to disclose that those high margins were achieved by illegal business practices:  "The Default Services margin[s] remained strong . . . .  In summary, we are pleased with our operating margins."

209.    Carbiener reinforced the importance of LPS's growing market share and "upside" in its Default Services segment:  "We were already increasing that [21% current] market share,

leveraging off of our current desktop customers.  Now that we've expanded that desktop customer base, we have even more faith in our ability to expand off of that low, low 21% share."  He also discussed the prospect of expanding LPS's 50% market penetration in foreclosures (via LPS's desktop solution) "even higher," to achieve "greater visibility into our market growth potential on the default side."

210.    Moreover, Carbiener misleadingly downplayed the significance of regulatory and legal actions stemming from the illicit behavior of DocX employees and other LPS personnel, characterizing DocX as small and insignificant, and stressing that LPS had quickly corrected the problem and completed necessary remedial actions ("***So from our standpoint, we've done everything we need to do.  We are satisfied there's not a problem***."):

> That being said, I can make a couple of comments to review what was put into that [2009 Form 10-K] disclosure and also to expand a little bit.  For those on the call that haven't really gone through that disclosure, the issue really related to one of our small subsidiaries ***that did limited document prep for a couple of clients, not extensive processes.  The financial results of that sub, it's hard to say they are even material.  They're very, very small.  And the services that they provide don't in any way tie into anything else we do from our core default processing***.

> Now, as part of our enterprise risk management process, we were reviewing the business processes of that subsidiary late last year, and we discovered that there was a problem with one of the processes that caused an error in the notarization process. So when we found or when we saw that error, we stepped in, we quickly corrected the process, we notified the impacted customers, and we began the remediation process.

> ***The one thing I will add because that's all in the disclosure, is that part of our remediation was to sit down with the management of that subsidiary, interview the management of that subsidiary so that we could make sure that in our minds, the business process that broke down was because of bad judgment, not because of ill intent.  And through those efforts, we became very satisfied that we could remediate, and that it was just true poor judgment and bad process.***

> So thinking about it, the respective regulatory bodies over the areas where the documents were filed, we had to expect that they would become aware that documents with incorrect notarization had been filed.  And that's exactly the case.

- 70 -

And when a regulatory body sees an error, they're going to want to ask questions as to why the error occurred and ask the party that created the error what was the intent.  So, that's exactly what happened with the clerk of the court in Atlanta, and we talk them through what happened.  We walked them through the processes.  We walked them through our corrective actions.  They were completely satisfied.  And as was disclosed in one of the articles, they closed their investigation, and it's over and done with.

From our standpoint, we believe the US attorney is making inquiries into the subsidiary and the processes of that subsidiary for the exact same reason.  So again, *we can say that with the actions we've taken to date, we believe that we have taken the necessary remedial action, and we've satisfied ourselves that the issue was the result of poor decision-making, not ill or criminal intent.*

And I think as we've stated before as well, we are cooperating fully with the US attorney.  We've actually expressed our willingness to meet, and we're just waiting on their schedule to accommodate the meeting.  *So from our standpoint, we've done everything we need to do.  We are satisfied there's not a problem.  We are satisfied there's not bad intent.  We've already confirmed that through working with one relevant regulatory agency, and we expect to be able to work through this.*

211.    The foregoing statements regarding the first quarter 2010 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150, 157, 169, 179, 188, 198, 202.  In particular, Defendants' assertion that they had conducted an extensive investigation and determined that the problem was not significant or material to investors was highly misleading because any investigation would have unearthed that the problem was massive, intentional and concerned over a million fraudulent documents filed in proceedings across the country.  Further, reported earnings, revenues and margins were falsely and misleadingly inflated through the use of illegal business practices.

**First Quarter 2010 Form 10-Q**

212.    On May 6, 2010, LPS filed its quarterly report for the first quarter of 2010 on Form 10-Q for the period ending March 31, 2010.  The first quarter 2010 Form 10-Q reaffirmed the financial results announced in the April 22, 2010 press release and April 23, 2010 conference call.

Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan.  Moreover, the first quarter 2010 10-Q contained the following statements emphasizing LPS's revenue and market share gains, particularly in the area of default management services:

- LPS projected an increase in the size of the overall default market due to a growing inventory of delinquent mortgage loans and loans in foreclosure, "which should in turn have a positive effect on our default revenues."  LPS added that a weaker economy favorably affects both its default management operations and its Desktop solution, given that the Desktop application was used primarily used in connection with default management.

- LPS reported increased year-over-year processing and services revenues both on a consolidated basis ($62.6 million, or 11.8%) and within its Loan Transaction Services segment ($40.8 million, or 10.9%) during the first quarter of 2010.  LPS attributed such gains partly to "growth in our default management services due to continued market share gains [5.2% during the quarter]."

213.    Regarding ongoing regulatory matters, Defendants misrepresented the true scope of their employees' illicit conduct and LPS's potential liability for such conduct.  LPS stated generically that it received, from time to time, regulatory inquiries and requests as a function of "the heavily regulated nature of the mortgage industry."  More specifically, LPS disclosed the following regarding documentation issues at DocX, assuring the market that DocX's services were limited and immaterial and that LPS had "immediately corrected" the problem and completed all necessary remedial action:

Recently, during an internal review of the business processes used by our document solutions subsidiary, we identified a business process that caused an error in the notarization of certain documents, some of which were used in foreclosure proceedings in various jurisdictions around the country.  The services performed by this subsidiary were offered to a limited number of customers, were unrelated to our core default management services and were immaterial to our financial results.  We immediately corrected the business process and began to take remedial actions necessary to cure the defect in an effort to minimize the impact of the error.  We subsequently received an inquiry relating to this matter from the Clerk of Court of Fulton County, Georgia, which is the regulatory body responsible for licensing the

notaries used by our document solutions subsidiary. In response, we met with the Clerk of Court, along with members of her staff, and reported on our identification of the error and the status of the corrective actions that were underway. We have since completed our remediation efforts with respect to the affected documents, and we believe that the matter with the Clerk of Court is closed. Most recently, we have learned that the U.S. Attorney's office for the Middle District of Florida is reviewing the business processes of this subsidiary. We have expressed our willingness to fully cooperate with the U.S. Attorney. We continue to believe that we have taken necessary remedial action with respect to this matter.

214.   The foregoing statements regarding the first quarter 2010 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150, 157, 169, 179, 188, 198, 202, 211. In particular, Defendants' assertion that they had conducted an extensive investigation and determined that the problem was not significant or material to investors was highly misleading because any investigation would have unearthed that the problem was massive, intentional and concerned over a million fraudulent documents filed in proceedings across the country. Further, reported earnings, revenues and margins were falsely and misleadingly inflated through the use of illegal business practices.

**May 14, 2010 *The Florida Times Union* Article and Carbiener's Response**

215.   On May 14, 2010, in an article entitled "Florida investigating 'bogus' foreclosure records," it was reported in *The Florida Times Union* that Florida's Attorney General was investigating whether LPS was involved with forging real estate documents for foreclosure lawsuits. LPS, through its spokeswoman Michelle Kersch, responded that "the company hasn't done anything wrong."

216.   On May 20, 2010, Defendant Carbiener wrote a letter to the Editor in response to the May 14 article:

> LPS is very involved in the Jacksonville community and highly values its role and reputation as a good corporate citizen.

Therefore, I believe it is vitally important to provide clarification to the May 14 article in *The Florida Times-Union*, "Florida Investigating 'Bogus' Foreclosure Records."

The article discusses LPS' subsidiary, Docx LLC, which provided a document preparation service to its customers and/or their attorneys from 2008 to 2009.

When a customer or its attorney requested that Docx prepare a document, Docx downloaded the information provided in the customer or attorney order into a pre-approved form provided by the customer or its attorney.

When preparing the documents, if specific pieces of information were not provided by the customer or attorney, Docx used the phrases "Bogus Assignee" and "Bad Bene" as highly visible placeholders that would then be replaced when the missing information was provided to Docx.

Unfortunately, on a few occasions, documents containing the placeholder phrases were inadvertently recorded before the field was updated.

While to our knowledge, none of these documents have been used in actual court proceedings, LPS deeply regrets this error.

However, these placeholder phrases had no other meaning other than to indicate that more information was needed.  Docx is not a party to any court proceedings and our role ends when the prepared documents are returned to the attorney or customer.

***In a separate matter, LPS reported in February that it identified a business process that caused an error in the notarization of certain documents, some of which were used in foreclosure proceedings.  LPS immediately corrected the business process and believes it has completed the remedial actions necessary to minimize the impact of the error.***

Finally, although LPS has not been contacted by the Florida attorney general regarding this or any other matter, LPS continues to express its willingness to cooperate with any governmental agency that contacts us.

JEFF CARBIENER,
president and CEO,
Lender Processing Services,
Jacksonville

217.    LPS and Defendant Carbiener fraudulently and misleadingly downplayed the significance of the illegal forgeries and fabricated document creation at DocX.  Indeed, as set forth herein, LPS was not even close to having completed the remedial actions to fix the millions of documents impacted by the illegal scheme.  Carbiener and LPS knew that the problems at DocX had not been remedied, because, for example, the Company was still in ongoing negotiations with AHMSI with regards to necessary steps to be taken and indemnification expenses.

**May 20, 2010 Annual Shareholder Meeting**

218.    On May 20, 2010, LPS hosted its annual shareholder meeting.  Defendant Carbiener told shareholders the year "was very much a success" and touted "our earnings are quality earnings. They translate into cash flow."  Further, Carbiener said:  "Because we have a strong business model, we're able to weather economic challenges."  Finally, Carbiener added:  "We've had good success and we expect that success to continue into the future."

**June 7, 2010 National Mortgage News Article**

219.    On June 7, 2010, it was again reported in the National Mortgage News that the Florida Attorney General's office had launched a civil investigation implicating LPS in the use of fabricated documents in foreclosure cases.  In the article, Kersch explained how incomplete documents had been inadvertently recorded in foreclosure proceedings before missing information was obtained.  However, LPS was said to be conducting its own investigation and, to date, had not found that any inadvertently recorded documents were used in a court proceeding.  Kersch added, "Moreover, Docx has no involvement in deciding whether or when documents are used in any court proceeding."

220.    The foregoing statements regarding the first quarter 2010 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150,

157, 169, 179, 188, 198, 202, 211, 214.  In particular, Defendants' assertion that they had conducted an extensive investigation and determined that the problem was not significant or material to investors was highly misleading because any investigation would have unearthed that the problem was massive, intentional and concerned over a million fraudulent documents filed in proceedings across the country.  Further, the assertion that LPS did not decide if documents were used in court proceedings was misleading as Defendants knew documents they prepared would be used in court proceedings, but utilized illegal means to prepare the documents regardless.

**Second Quarter 2010 Earnings Release and Conference Call**

221.    On July 22, 2010, LPS issued a press release stating:  "Lender Processing Services, Inc. (NYSE:LPS), a leading provider of integrated technology and services to the mortgage and real estate industries, today reported consolidated revenues of $599.1 million for the second quarter of 2010, a decrease of 2.3% compared to the second quarter of 2009; however, net earnings of $80.4 million or 85 cents per diluted share in the second quarter of 2010 increased from $75.2 million or 78 cents per diluted share in the prior year quarter."  The press release was filed concurrently on Form 8-K with the SEC.

222.    In this press release, Kennedy assured investors, "LPS had a strong quarter despite very difficult conditions in both the origination and default markets and a sustained challenging macro-economic environment.  LPS, with its comprehensive end-to-end solutions for the mortgage and real estate industries, remains well positioned for a solid 2010 and to continue to grow profitably in 2011 and beyond."

223.    Carbiener added that "we continued to expand market share" in both the Loan Facilitation and Default Services businesses.

224.    On the following day, July 23, 2010, LPS hosted an earnings conference call with analysts to discuss second quarter 2010 financial results.  Carbiener and Chan participated in this call.  Carbiener focused on LPS's growing market share, especially in its default services segment. He stated that a year-over-year revenue decline of 8.2% in default services "was actually a strong performance when compared to the 16% decline in foreclosure starts . . . primarily driven by market share gains and increasing revenues in our asset management services business."  He added: "And we anticipate that the Desktop conversions mentioned earlier will open up additional opportunities for growth into our default businesses over the next few years, as we have shown a strong track record of leveraging technology relationships to drive sales of our other solutions."

225.    Chan reinforced the same, stating that, although revenues for default services decreased 8.2%, industry foreclosure starts declined by a greater percentage, a difference "primarily the result of market share gains, as we continue to offer timely solutions to our customers in this increasingly regulated environment."

226.    Defendant Carbiener stated:  "These results demonstrate our ability to maintain strong margins and earnings in a very challenging marketplace."

227.    Thereafter, when asked about potential business from "three major lenders" that recently implemented LPS's Desktop technology, Carbiener described "a lot of upside across the Board" with respect to default services given that "the three major lenders we're talking about control a lot of the volumes in the country."  He credited LPS's ability to "penetrate with the technology."  LPS leveraged Desktop to gain additional default services revenues:  "So, it's really the integration of the individual services back into the core platform, our ability to tie the whole thing together for a lender so that they have one vendor to deal with.  Not just for the technology, but also for the various services that have to take place over the course of the foreclosure."

**Second Quarter 2010 Form 10-Q**

228.    On August 9, 2010, LPS filed its quarterly report for the second quarter of 2010 on Form 10-Q for the period ending June 30, 2009.  The second quarter 2010 Form 10- Q reaffirmed the financial results announced in the July 22, 2010 press release and July 23, 2010 conference call. Further, it contained substantially the same SOX certifications that were included in LPS's second quarter 2008 10-Q, which were also signed by Carbiener and Chan.  Moreover, the second quarter 2010 Form 10-Q contained the following statements touting "continued market share gains" in default management services and the expectation that market factors would positively affect default revenues:

- LPS projected a stable or slightly smaller overall default market in 2010 (compared to 2009) due to a growing inventory of delinquent mortgage loans and loans in foreclosure, "which should in turn have a positive effect on our default revenues."  LPS added that a weaker economy favorably affects both its default management operations and its Desktop solution, given that the Desktop application was used primarily in connection with default management.

- LPS reported decreased year-over-year processing and services revenues both on a consolidated basis ($48.5 million, or 4.2%) and within its Loan Transaction Services segment ($32.5 million, or 7.3%) during the second quarter of 2010 due to decreasing industry trends, but stated that such decreases were offset by continued market share gains in both loan facilitation and default management services.

229.    Additionally, Defendants continued to downplay the severity of ongoing regulatory matters, again pointing generically to the "heavily regulated nature of the mortgage industry" as the reason for inquiries and requests for information from various regulators "from time to time."  LPS referenced specific inquiries by the U.S. Attorney and Florida General, but assured the market that such inquiries would not have a material adverse impact on LPS:

As previously disclosed, the U.S. Attorney's office for the Middle District of Florida has been conducting an inquiry concerning certain business processes of our

document solutions business. The Florida Attorney General has initiated a similar civil inquiry. We have been cooperating and we have expressed our willingness to continue to fully cooperate with these inquiries, and we do not believe that the outcome of these inquiries will have a material adverse impact on our business or results of operations.

230. The foregoing statements regarding the second quarter 2010 financial results were materially false and misleading for the same reasons articulated in §§IV and V, and ¶¶ 143, 150, 157, 169, 179, 188, 198, 202, 211, 214, 220. In particular, it was misleading for Defendants to assert that they did "not believe that the outcome of these inquiries will have a material adverse impact on our business or results of operations." Any investigation would have shown the problem was material, intentional and exposed the Company to significant risk.

## VII.   LOSS CAUSATION

231. As detailed herein, Defendants engaged in a scheme to artificially inflate the value of LPS common stock. LPS cut costs by eliminating quality controls and abandoning compliance with legal requirements, thereby artificially inflating reported profits. Defendants' conduct put the Company at huge, undisclosed risk.

232. As alleged *supra* at ¶¶52-65, on April 3, 2010, the first of a series of partial disclosures revealing Defendants' fraudulent scheme and its implications for LPS emerged. The disclosures of Defendants' fraudulent scheme, and the market's understanding of the resulting and foreseeable consequences of Defendants' scheme caused LPS's stock price to decline precipitously and Plaintiffs were damaged as a result. The decline caused Plaintiffs economic harm.

233. While the fraudulent and criminal fabrication of mortgage-related documents benefitted LPS and the Individual Defendants, the scheme exposed Plaintiffs to foreseeable and material undisclosed risks that, among other things: (i) LPS's scheme would be discovered by regulators and cause the Company to incur substantial fines and sanctions; (ii) LPS's scheme would

be discovered by customers and/or perspective customers, who would decline to do business with LPS and would seek indemnification from the Company for its wrongdoing and subsequent losses suffered by LPS's customers; (iii) LPS's scheme would be uncovered, and the Company would be unable to continue to enjoy such high margins and would have to hire additional employees to perform services for its clients; and (iv) the judicial and other bankruptcy and foreclosure mechanisms that relied upon accurate legal documents prepared by LPS would discover that LPS had robo-signed, falsified and/or fabricated such documents, and such defaults and bankruptcies would be curtailed until problems with LPS's documents could be fixed.  These undisclosed material risks and others – which were the foreseeable result of Defendants' fraudulent scheme to fraudulently and criminally fabricate mortgage-related documents – materialized and caused the market value of LPS common stock to decline to the detriment of Plaintiffs.

234.    As detailed herein, Defendants' fraudulent scheme artificially inflated LPS's stock price by failing to disclose that: (a) throughout the relevant period, LPS's revenues were the product of illicit practices; (b) LPS employed myriad illicit business practices at its various locations, including the fabrication of documents, robo-signing, surrogate signing, improper notarization, and the violation of security protocols; (c) LPS created a culture which valued speed over accuracy and led to significant errors in the default services it provided; (d) such errors were knowingly concealed from clients, attorneys, and courts; (e) as a result of these illicit practices, Defendants caused significant numbers of deficient, erroneous, and otherwise fraudulent documents to be filed with county recorders' offices and courts throughout the country; and (f) as a result of Defendants' schemes, LPS's profits, revenues and other financial metrics were artificially inflated.

235.   These false and misleading statements, individually and collectively, concealed LPS's true financial circumstances and future business prospects, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about LPS was revealed.

236.   As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged herein, Plaintiffs purchased LPS common stock at prices far exceeding its true worth.

237.   LPS shareholders, including Plaintiffs, were injured when the scheme was revealed and it became apparent that LPS had engaged in illegal conduct at the core of its business operations.

238.   As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged herein, Plaintiffs were damaged when the market value of LPS common stock declined upon partial disclosures of the fraud, including disclosures that (i) LPS had in fact illegally executed mortgage-related documents; (ii) LPS would need to investigate the scope of its illegal document preparation services; (iii) foreclosures around the country could be held-up or invalidated because of LPS's conduct; (iv) the Defendants were being investigated by the government for criminal conduct; and (v) Defendants had not acted with integrity and in compliance with regulatory regulations and ethical mores demanded by the investing community.

239.   Defendants' false and misleading statements and failure to disclose material facts known to them concealed factors concerning the material and foreseeable risks that: (i) the Company and/or its executives would be prosecuted criminally for their conduct; (ii) the Company would have to engage in a lengthy and expensive investigation of its conduct; (iii) there would be a public outcry calling for foreclosures nationwide to be temporarily suspended as a result of LPS's conduct calling into question the legitimacy of judicial proceedings; (iv) customers would seek indemnification and/or reimbursement; and, (v) loss of future business as customers and prospective customers lose

confidence in LPS's ability to perform.  These undisclosed material risks, which were the foreseeable result of Defendants' fraudulent scheme to illegally cut corners in the processing of mortgage related documents materialized, causing the market value of the LPS common stock to decline to the detriment of Plaintiffs.

240.    As a direct and proximate result of Defendants' material misrepresentations, omissions and conduct as alleged herein, Plaintiffs have been damaged by their purchase of LPS common stock.

241.    Defendants' false and misleading statements directly or proximately caused, or were a substantial contributing cause of, the damages and economic loss suffered by Plaintiffs, and maintained the artificial inflation in the price of LPS Common Stock until the truth was revealed to the market.

## VIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

242.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading concerned statements of existing or historical fact or conditions.  To the extent that any of the statements alleged to be false and misleading may be deemed to be forward-looking statements, Defendants are nevertheless liable for those statements because they were not identified as forward-looking statements.  Even if the statements were identified as forward-looking, the statements were material and were not accompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements and, at the time each of those statements was made, Defendants had actual knowledge that the particular forward-looking statement was false or the forward-looking statement was authorized and/or approved by an officer

of LPS who knew that the statement was false when made.  Further, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements that later became inaccurate and/or did not disclose information that undermined the validity of those statements.

## IX.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Against Defendants Carbiener, Chan, and LPS for Violations of §10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5

243.    Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

244.    Defendants Carbiener, Chan and LPS, along with other LPS employees, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of LPS, as specified herein.

245.    Defendants Carbiener, Chan and LPS: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit in an effort to maintain an artificially high market price for LPS common stock in violation of §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

246.    Defendants Carbiener, Chan and LPS also: (i) deceived the investing public, including Plaintiffs, as alleged herein; (ii) artificially inflated and maintained the market price of

LPS's common stock; and (iii) caused Plaintiffs to purchase LPS's common stock at an artificially inflated price.

247.    Defendants Carbiener and Chan's primary liability, and controlling person liability, arise from the following facts: (i) each was a high-level executive and/or director at the Company; (ii) each, by virtue of his/her responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial performance, projections and/or reports; and (iv) each was aware of the Company's dissemination of information to the investing public, which each knew or disregarded with severe recklessness was materially false and misleading.

248.    Defendants Carbiener and Chan, because of their positions with the Company, possessed the power and authority to control the contents of LPS's publicly disseminated information.  Defendants Carbiener and Chan were provided with copies of the Company's reports, press releases and documents alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, Defendants Carbiener and Chan knew that the adverse facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

249.    Defendants Carbiener, Chan and LPS had actual knowledge of the misrepresentations and omissions of material facts alleged herein, or acted with reckless disregard for the truth by failing to ascertain and disclose such facts, even though such facts were available.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing LPS's adverse operating condition and financial condition, including its

illegal falsification of mortgage-related documents, from the investing public and supporting the artificially inflated price of its securities. As alleged herein, Defendants had actual knowledge of the misrepresentations and omissions alleged, or were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

250.    As a result of the fraudulent activities of Defendants described above, the market price of LPS common stock was artificially inflated. In ignorance of the fact that the market price of LPS common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which LPS common stock traded at the time when such statements were made, Plaintiffs acquired LPS common stock at artificially high prices and was damaged thereby, as evidenced by, among other factors, the stock price declines identified herein that released the artificial inflation from LPS common stock. At the time of the alleged misrepresentations and omissions, Plaintiffs were unaware of their falsity, and believed the false statements to be true. Had Plaintiffs known the true nature of the operations of LPS and the non-compliance with federal and state law, Plaintiffs would not have purchased or otherwise acquired LPS common stock.

251.    Plaintiffs actually read (and/or listened to) and relied upon Defendants' false and misleading statements as set forth herein.

252.    Plaintiffs are entitled to the presumption of reliance established by the fraud-on-the-market doctrine. At all times relevant to this Complaint, the market for LPS common stock was an efficient market. LPS common stock was listed and actively traded on a highly efficient and automated market; LPS filed periodic public reports with the SEC; LPS was followed by numerous securities analysts employed by leading brokerage firms and investment banks who wrote reports

about the Company; and, LPS regularly issued press releases, which were carried by national and international news wires, and which were publicly available and entered into the public marketplace. As a result, the market for LPS equity securities promptly digested current information regarding LPS from all publicly-available sources and reflected such information in the LPS common stock price.

253.    Plaintiffs are also entitled to the presumption of reliance established by the *Affiliated Ute* doctrine as Defendants failed to disclose material known facts to the market concerning Defendants' illegal falsification of mortgage-related documents.

254.    The market prices for LPS common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.

255.    As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered damages in connection with their purchase of LPS common stock.

256.    By virtue of the foregoing, Defendants violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, promulgated thereunder.

## SECOND CAUSE OF ACTION

### Against Defendants Carbiener and Chan for Violations of §20(a) of the Securities Exchange Act of 1934

257.    Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint.

258.    During the relevant period, Defendant Carbiener participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of LPS's business affairs.  Because of Carbiener's senior positions, he knew the adverse non-public information about LPS's illegal falsification of mortgage-related documents.

259.     As an officer of a publicly owned company, Defendant Carbiener had a duty to disseminate accurate and truthful information with respect to LPS's financial condition and results of operations, and to correct promptly any public statements issued by LPS which had become materially false or misleading.

260.     Because of Carbiener's position of control and authority as a senior officer of LPS, Carbiener was able to, and did, control the contents of the various reports, press releases and public filings which LPS disseminated in the marketplace during the relevant period concerning the Company's results of operations.  Throughout the relevant period, Carbiener exercised his power and authority to cause LPS to engage in the wrongful acts complained herein.  Carbiener, therefore, was a "controlling person" of LPS within the meaning of §20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of LPS common stock.

261.     During the relevant period, Defendant Chan participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of LPS's business affairs.  Because of Chan's senior positions, he knew the adverse non-public information about LPS's illegal falsification of mortgage-related documents.

262.     As an officer of a publicly owned company, Chan had a duty to disseminate accurate and truthful information with respect to LPS's financial condition and results of operations, and to correct promptly any public statements issued by LPS which had become materially false or misleading.

263.     Because of his position of control and authority as a senior officer of LPS, Chan was able to, and did, control the contents of the various reports, press releases and public filings which LPS disseminated in the marketplace during the relevant period concerning the Company's results of

operations.  Throughout the relevant period, Chan exercised his power and authority to cause LPS to engage in the wrongful acts complained herein.  Chan, therefore, was a "controlling person" of LPS within the meaning of §20(a) of the Exchange Act.  In this capacity, he participated in the unlawful conduct alleged which artificially inflated the market price of LPS common stock.

264.    As set forth herein, and without conceding the necessity of such pleading, the Defendants Carbiener and Chan knew the statements issued by LPS during the relevant period were materially false and misleading.

265.    By reason of the above conduct, Defendants Carbiener and Chan are each jointly and severably liable pursuant to §20(a) of the Exchange Act for LPS's primary violations of the Exchange Act as alleged herein.

### THIRD CAUSE OF ACTION

### Against LPS and the Individual Defendants for Common Law Fraud

266.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs of this Complaint as if fully set forth herein.  This claim is asserted against all Defendants based on common law principles of fraud and conspiracy.

267.    As alleged herein, each of the Defendants made material misrepresentations and omitted to disclose material facts about LPS, its business practices and its financial condition.

268.    In addition, the Defendants conspired with each other for the purpose of misleading Plaintiffs and the investing public regarding LPS's financial condition and prospects, and each committed overt acts, including the making of false and misleading statements, in furtherance of such conspiracy.

269.     The aforesaid misrepresentations and omissions by the Defendants were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs and the investing public when making investment decisions.

270.     The aforesaid misrepresentations and omissions by the Defendants constitute fraud and deceit under common law.

271.     Plaintiffs reasonably relied upon the Defendants' misrepresentations when deciding to purchase LPS's common stock, and did not know of any of the misrepresentations and omissions, as alleged with further detail herein.

272.     As a direct and proximate result of Defendants' fraud and deceit, Plaintiffs suffered damages in connection with its purchase of LPS common stock.

273.     Defendants' fraud and deceit was intentional and/or involved conscious acts that willfully and wantonly disregarded the rights of others, including not only Plaintiffs, but the investing public.  As a result, Defendants should be required to pay punitive damages to Plaintiffs.

## FOURTH CAUSE OF ACTION

### Against Defendants LPS, DocX, and Brown for Violation of Georgia Civil RICO

274.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

275.     This claim for relief arises under O.C.G.A. § 16-14-6 of the Georgia RICO Act, and seeks relief from Defendants LPS, DocX and Brown for activities described herein for violations of O.C.G.A. § 16-14-4 (a), (b).  Plaintiffs further seek relief from Defendants LPS, DocX and Brown for conspiring to violate O.C.G.A. § 16-14-4 (a), (b), pursuant to subsection (c) thereof.  Defendants Carbiener and Chan are not named under this account.

- 89 -

276.   This action is timely under O.C.G.A. § 16-14-8, as this civil action has been commenced within five years after Defendants' racketeering conduct and within five years of Plaintiffs suffering injuries causing their cause of action to accrue.  Further, Plaintiffs bring this cause of action within two years of the pendency of the criminal prosecution of Defendant Brown.

277.   Defendants named, along with unnamed others, herein operate and constitute an enterprise within the meaning of O.C.G.A. § 16-14-3, which affects interstate and foreign commerce and transacts business in the State of Georgia (whether or not they are registered to do so). Defendants own a substantial interest in the enterprise and were at all relevant times associated with the enterprise and conspirators forming the enterprise as partners, principals, members, managers, officers, directors, and significant shareholders thereof (as applicable).  Defendants, directly or indirectly, and through the acts of their agents, employees and servants, participated in and controlled the conduct and affairs of the enterprise through a pattern of racketeering activity in violation of O.C.G.A. § 16-14-4 (a) - (b).

278.   Defendants conspired, furthermore, to undertake the foregoing, in violation of O.C.G.A. § 16-14-4 (c).

279.   Pursuant to O.C.G.A. § 16-14-3(8)(A), Defendants and/or their agents and employees have engaged in a pattern of racketeering activity by providing false and misleading information to Plaintiffs as an inducement to invest in the shares of LPS and by engaging in two or more acts of racketeering activity, as such term is defined in O.C.G.A. § 16-14-3, such acts having occurred within the last five (5) years.

280.   The scheme described throughout the complaint perpetrated by Defendants consisted of multifarious racketeering activities.  In carrying out the overt acts in furtherance of their scheme

described herein, defendants engaged in, *inter alia*, conduct in violation of federal and Georgia state laws, including, without limitation:

(a) mail fraud in violation of 18 U.S.C. § 1.341 and O.C.G.A. § 16-14-3 (9)(A)(xxix);

(b) wire fraud in violation of 18 U.S.C. § 1343 and O.C.G.A. § 16-14-3 (9)(A), (xxix);

(c) forgery in the first degree in violation of O.C.G.A. § 16-14-3 (9)(A)(viii);

(d) perjury and other falsifications in violation of § 16-14-3 (9)(A)(xv);

(e) tampering with evidence in violation of § 16-14-3 (9)(A)(xvi); and,

(f) residential mortgage fraud in violation of § 16-14-3 (9)(A)(xxxx).

281.    Such conduct constitutes predicate acts under Georgia RICO.  The foregoing violations of federal and Georgia state law constitute racketeering activities pursuant to O.C.G.A. § 16-14-3 (9)(A).

282.    All of the conduct herein alleged was committed by Defendants willfully, knowingly and maliciously and with reckless disregard of the rights of Plaintiffs.

283.    At all material times, Defendants controlled and/or conducted the enterprise described herein which engaged in substantial interstate and foreign commerce, and transacted business in the State of Georgia (whether or not they are registered to do so).  The transactions complained of herein negatively impacted interstate and foreign commerce by the use of the instrumentalities of such commerce for illegal purposes.

284.    At all material times, in connection with the activities giving rise to this action, Defendants willfully and knowingly conspired with each other, as well as others known and unknown to Plaintiffs and the Class, to engage in various activities set forth herein and aided and abetted one another in these activities, all as proscribed and prohibited by O.C.G.A. §16-14-4 (a), (b) and (c) thereof.

285.   In furtherance of and for the purpose of executing the scheme, Defendants used the United States Mail and wire communications.

286.   As is described more fully above, Defendants engaged in a "pattern of racketeering activity," as defined in O.C.G.A. § 16-14-3(8)(A), by committing and/or conspiring to or aiding and abetting a scheme for at least two such acts of racketeering activity, as described above.  Defendants' scheme involved the illegal falsification of over a million mortgage-related documents, transfer of some of those illegally falsified documents through the instrumentalities of the U.S. Mails and/or wires, and lies and false statements covering up the scheme to illegally falsify mortgage-related documents, each of which was an act of racketeering activity.  Said scheme took place over the span of six years, with many thousands of acts of falsification of mortgage-related documents occurring within four years of other such acts.

287.   Defendants' acts of racketeering activity were related.  Defendants falsified mortgage-related documents – thereby committing perjury, wire fraud, mail fraud, evidence tampering, and residential mortgage fraud, and lied about such conduct – as part of an overarching scheme employing similar methods of commission as documented by LPS's internal policies and as evidenced by Defendants' admissions detailed herein.

288.   In furtherance of their scheme to defraud, Defendants sent misleading information to Plaintiffs to keep Plaintiffs from discovering the misrepresentations and to discourage Plaintiffs from pursuing their legal rights.

289.   Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs.  The acts of racketeering activity committed by Defendants had the same or similar objectives.  The racketeering activity was intended to enable LPS's clients to

foreclose on homeowners while keeping LPS's costs to a minimum so that LPS could record higher profits and increase its share price without disclosing the truth to the public, including LPS investors, that LPS's reported earnings were built on an illegal enterprise.

290.     The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by defendants, as described above, were related to each other and amount to racketeering activity, and therefore constitute a "pattern of racketeering activity," as defined in O.C.G.A. § 16-14-3(8)(A).

291.     As demonstrated in detail herein, Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering actions in furtherance of the conspiracy including systematic violations of federal and state law described herein, designed to defraud Plaintiffs.

292.     Defendants and their co-conspirators' pattern of illegal racketeering acts include, *inter alia*, misrepresentations and omissions regarding the falsification of mortgage-related documents and the means by which LPS falsely drove up its earnings and share price by reducing costs through the illegal processing and/or fabrication of documents for use in court proceedings.

293.     The nature of the above-described acts, material misrepresentations, omissions, and violations of federal and state law in furtherance of the conspiracy give rise to the inference that defendants not only agreed to the objective of the violations of O.C.G.A. § 16-14-4 (c), by conspiring to violate O.C.G.A. § 16-14-4 (a), (b), but were also aware that their ongoing fraudulent and otherwise illegal acts have been and are a part of an overall pattern of racketeering activity.

294.     Absent Defendants' conspiracy and joint efforts, Defendants' scheme would have been unsuccessful.  Acting jointly, Defendants were able to successfully engage in the activities set

forth herein and to report false and misleading financial results that concealed the truth from their unwitting victims, including Plaintiffs.

295.    Defendants received income derived from the pattern of racketeering activity. Defendants re-invested racketeering income in LPS to perpetuate the enterprise.

296.    As a direct and proximate result of Defendants' overt and predicate acts in furtherance of violating O.C.G.A. § 16-14-4 (a), (b), and by conspiring to violate such provisions, pursuant to O.C.G.A. § 16-14-4 (c), Plaintiffs were injured when the truth was revealed and LPS's stock price declined significantly, as set forth herein.

297.    Plaintiffs were injured by Defendants' re-investment of racketeering income in LPS. Among other things, Defendants' illegal enterprise created racketeering income that was used to perpetuate the Defendants' illegal scheme by hiring more employees to create more fictitious mortgage-related documents.  Furthermore, Defendants' illegal enterprise was used by LPS to win market share and cross-sell other mortgage-related services to clients, thereby painting a false and misleading picture of LPS's business prospects – the revelation of which damaged Plaintiffs.

298.    Defendants' fraudulent scheme and enterprise had many victims, including thousands of investors, borrowers, servicers, and court systems throughout the country.

299.    Defendant LPS is liable under this count directly, and vicariously for the actions of its employees.

300.    In accordance with O.C.G.A. § 16-14-6, Plaintiffs and the Class are entitled to recover three times the actual damages sustained, plus punitive damages from Defendants as well as attorneys' fees in the trial and appellate courts and costs and expenses of investigation and litigation reasonably incurred.

## FIFTH CAUSE OF ACTION

### Against Defendants LPS, DocX, and Brown for Violation of Florida Civil RICO

301.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

302.    This is an action for violations of the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. sec. 772.101 et seq., also known as the Florida Civil RICO Act.

303.    Fla. Stat. sec. 772.104 provides that any person who has been injured by reason of the provisions of sec. 772.103 shall have a civil cause of action for threefold actual damages and also for reasonable attorneys' fees and court costs through the trial and appellate courts.

304.    Fla. Stat. sec. 772.103 details the prohibited activities under the Florida Civil RICO Act.

305.    As detailed herein, Defendants engaged in "criminal activity" as defined in Fla. Stat. sec. 772.102(1)(a)22 (fraud); 24 (forgery); 27 (perjury); and 34 (tampering with evidence).   In addition, as detailed herein, Defendants engaged in "criminal activity" as defined in Fla. Stat. sec. 772.102(1)(b) by engaging in conduct subject to indictment or information as a criminal offense as listed in 18 U.S.C § 1961(1)(B) (wire fraud and mail fraud).

306.    As set forth above, Defendants participated in a scheme to fabricate mortgage-related documents and were responsible for more than a million fraudulent documents being filed. Defendants directed Company employees to forge and falsify documents relied on by property recorders, title insurers and others.   Defendants did this so the Company could keep costs down while processing loan documents, thereby reporting higher earnings to the public, and inflating the Company's stock price.   Moreover, Defendants repeatedly lied to the public about the illegal practices, which lies Plaintiffs relied upon when purchasing LPS stock.

- 95 -

307.    As set forth above, the Plaintiffs reasonably relied upon Defendants' false and misleading representations, which directly and proximately caused the Plaintiffs to suffer damages as a direct and proximate cause of the pattern of criminal activity engaged in by Defendants.  When the truth was partially revealed, and the risks associated with Defendants' conduct materialized, LPS's stock dropped substantially and Plaintiffs were injured.

308.    Defendants' fraudulent scheme and enterprise had many victims, including thousands of investors, borrowers, servicers, and court systems throughout the country.

309.    In order to accomplish their objective, Defendants developed and were part of an enterprise, which consisted of Defendants LPS, DocX, and Brown, as well as numerous other employees of LPS who participated in the fraudulent scheme and various law firms that knowingly utilized the false and/or illegally fabricated mortgage-related documents in bankruptcy and foreclosure proceedings in the State of Florida and elsewhere.  The participants in the enterprise worked together for the specific purpose of furthering the pattern of criminal activity set forth herein, including notary fraud and a regular pattern and practice of filing false and perjured documents in the public records and the courts.

310.    As alleged herein, Defendants and others engaged in a pattern of criminal activity lasting over six years that involved numerous incidents resulting in the filing of over a million fraudulent documents in courts and recording offices around the country.

311.    Defendants received proceeds, both directly and indirectly, from their pattern of criminal activity as LPS was able to charge clients for the illegal services the Company provided, and artificially inflate the Company's stock price as a result.

312.    Plaintiffs were injured by Defendants' re-investment of racketeering income in LPS. Among other things, Defendants' illegal enterprise created racketeering income that was used to

perpetuate the Defendants' illegal scheme by hiring more employees to create more fictitious mortgage-related documents.  Furthermore, Defendants' illegal enterprise was used by LPS to win market share and cross-sell other mortgage-related services to clients, thereby painting a false and misleading picture of LPS's business prospects – the revelation of which damaged Plaintiffs.

## SIXTH CAUSE OF ACTION

### Against All Defendants for Negligent Misrepresentation

313.   Plaintiffs incorporate by reference each of the substantive paragraphs of this Complaint except allegations that the Defendants made the untrue statements of material facts and omissions intentionally or recklessly.  For the purposes of this claim, Plaintiffs assert only negligence claims and expressly disclaim any claim of fraud or intentional misconduct.

314.   LPS had a legal duty to provide shareholders, including Plaintiffs, with correct information concerning the Company's business operations.

315.   The Individual Defendants, as officers and directors of LPS, had a legal duty to report accurate information concerning the Company's business operations so that information could be reported to shareholders and/or had a personal duty to provide shareholders, including Plaintiffs, with correct information concerning the Company's business operations.

316.   Defendants made and/or caused to be made false and misleading statements to shareholders, including Plaintiffs, concerning, among other things, LPS's business practices and illegal falsification of mortgage-related documents, as alleged herein.

317.   Defendants knew, or should have known, that their statements to shareholders, including Plaintiffs, were false and misleading.

318.   Defendants' false and misleading statements to shareholders, including Plaintiffs, concerning LPS's business practices and illegal falsification of mortgage-related documents, were

made for a serious purpose, and Defendants knew that shareholders, including Plaintiffs, desired this information for a serious purpose, *i.e.*, to make multi-million dollar investment decisions.

319.    Plaintiffs intended to rely and act upon Defendants' false and misleading statements, and did in fact reasonably rely upon Defendants' false and misleading statements to Plaintiffs' detriment.

320.    The market prices for LPS common stock declined materially upon the various public disclosures of the true facts that had been misrepresented or concealed as alleged herein.

321.    The market prices for LPS common stock declined materially when the foreseeable risks concealed by Defendants' misleading statements materialized.

322.    As a direct and proximate result of the alleged wrongful conduct, Plaintiffs suffered damages in connection with their purchase of LPS common stock.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Requiring Defendants to pay damages sustained by Plaintiffs by reason of the acts and transactions alleged herein.

B.    Requiring Defendants to pay punitive damages for their violations of common law fraud and Georgia RICO and by reason of the acts and transactions alleged herein.

B.    Requiring Defendants to pay treble damages sustained by Plaintiffs in accordance with Georgia and/or Florida RICO and by reason of the acts and transactions alleged herein.

C.    Awarding Plaintiffs prejudgment interest and post-judgment interest as allowed pursuant to statutory and common law, as well as their reasonable attorneys' fees, expert fees and other costs.

D.    Awarding such other and further relief as the Court may deem just and proper.

## XI.    JURY TRIAL DEMAND

Plaintiffs demand a trial by jury.

DATED:  August 5, 2013                    DIETRICH SIBEN THORPE LLP


By: _____

Matthew P. Siben
2173 Salk Avenue, Suite 250
Carlsbad, CA  92008
Telephone: (760) 579-7368
Facsimile: (760) 579-7369
– and –
David A. Thorpe
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212
Telephone: (310) 300-8450
Facsimile: (310) 300-8401

Attorneys for Plaintiffs Maverick Fund, L.D.C.,
Maverick Fund USA, Ltd., Maverick Fund II, Ltd.,
Maverick Neutral Fund, Ltd., Maverick Neutral
Levered Fund, Ltd., Maverick Long Fund, Ltd., and
Maverick Long Enhanced Fund, Ltd.